625 P.2d 354

**MAGNA INVESTMENT & DEVELOPMENT CORPORATION, a Utah corporation; Sierra Investment Company, an Arizona corporation; Joseph K. Kivel and Esther Kivel, his wife; A. Victor Kivel and Betty Jean Kivel, his wife; Daniel Kivel and Beverly Kivel, his wife; Alvin Kivel and Janice Kivel, his wife; and Federated Department Stores, Inc., on behalf of its Levy's Division, Plaintiffs/Appellees,**

v.

**PIMA COUNTY, a body politic; Arizona Department of Revenue and the State of Arizona, Defendants/Appellants.**

No. 2 CA–CIV 3717.

Court of Appeals of Arizona, Division 2.

Jan. 23, 1981.

Rehearing Denied March 4, 1981.

Miller, Pitt & Feldman, P. C. by Gerald Maltz, Tucson, for plaintiffs/appellees.

Stephen D. Neely, Pima County Atty., by Peter E. Pearman, Deputy County Atty., Tucson, for defendant/appellant Pima County.

Robert K. Corbin, Atty. Gen., by Barbara E. Fisher, Asst. Atty. Gen., Tucson, for defendants/appellants Department of Revenue and State of Arizona.

## OPINION

HATHAWAY, Chief Judge.

In this appeal we are asked to determine whether the superior court erred in its finding that the full cash value placed upon the subject property by the county assessor for purposes of 1979 real property taxation was excessive, and in ruling on two pretrial discovery motions.

This case involves an appeal from the county assessor's determination of the full cash value of Levy's Department Store, including approximately 17.7 acres of land, located in El Con shopping center for the tax year 1979. Levy's is a three-story department store consisting of 298,483 square feet. The remaining portion of the subject property is used for parking. The property is owned by appellees Magna Investment and Development Corporation, Sierra Investment Company and the Kivels and the building is leased to appellee Federated Department Stores, Inc., Levy's parent corporation. The original term of the lease is for 30 years from December 3, 1969, to December 3, 1999, with five separate renewal options of ten years each. The lease provides that real estate taxes are to be paid by the tenant. Even though Levy's is a part of El Con shopping center, the subject property is assessed separately and independently from any other portion of the shopping center.

The county assessor placed a full cash value on the property as of January 1, 1979, of $7,240,228 ($1,235,724 for real estate plus $6,004,504 for improvements). After appellees' petitions for review were denied by the appropriate administrative agencies, they appealed to superior court pursuant to A.R.S. Sec. 42–152. In anticipation of trial, the opposing parties each hired expert appraisers to prepare appraisal reports on the subject property. Appellees' witness, Mark H. Klafter, testified that in his opinion the full cash value of the property as of January 1, 1979, was $6,000,000. Klafter's 99-page appraisal report was admitted into evidence and he remained on the witness stand for approximately one day at trial. Appellants, including Pima County, the state Department of Revenue and the State of Arizona, hired Lawrence E. Brown as their expert. Brown, who prepared a 60-page report and also testified for one day, valued the property at $10,400,000. Aside from two other minor witnesses, the entire trial centered on the opinions of these two expert appraisers.

The trial court made specific findings of fact and conclusions of law. It found that Klafter's appraisal was the more objective and the better of the two appraisals, that Klafter was better qualified than Brown to make the appraisal, and that the assessment of $7,240,228 made by the county assessor was excessive. Finding of fact No. 11 stated:

"11. The appraisal report of Mr. Klafter, plaintiffs' Exhibit 1, correctly reflects the full cash value of the subject property and the Court adopts said appraisal as the Findings of the Court."

Appellants contend that the decision of the trial court should be reversed and the assessor's valuation of the subject property should be upheld. The issues raised by the parties can be set forth as follows:

1. Was there sufficient evidence to strike down the full cash value placed on the subject property by the county assessor?

2. Did the trial court err in refusing to compel the production of the leases and rents of all El Con stores and in requiring the assessor to disclose Brown's appraisal report prior to trial?

## SUFFICIENCY OF THE EVIDENCE

■ Appellants argue that the evidence fails to support the trial court's conclusion that the assessor's valuation is excessive and that the full cash value of the property is $6,000,000, and that appellees have failed to show by competent evidence that the assessor's valuation was excessive. In reviewing the evidence, we note that the law regarding our standard of review in tax appeals is clear. The trial court may not make an independent valuation of the full cash value (market value) of the subject property until two conditions have been met. First, evidence must be presented to rebut the statutory presumption under A.R.S. Sec. 42–152(B) that the valuation "as approved by the appropriate state or county authority [is] correct and lawful." Second, the court must determine whether the valuation is excessive or insufficient. Such a preliminary finding is a condition precedent to the court's making its own evaluation of the facts. The evidence of excessiveness or insufficiency may also be a part or all of the evidence in determining full cash value. *Department of Property Valuation v. Trico Electric Cooperative, Inc.*, 113 Ariz. 68, 546 P.2d 804 (1976); *Graham County v. Graham County Electric Cooperative, Inc.*, 109 Ariz. 468, 512 P.2d 11 (1973); *Navajo County v. Four Corners Pipe Line Co.*, 106 Ariz. 511, 479 P.2d 174 (1970), reh. den. 107 Ariz. 296, 486 P.2d 778 (1971).

■ Our review of the evidence shows that the trial court's decision was based on competent evidence sufficient to substantiate the finding of excessiveness, and that it acted properly in adopting Klafter's appraisal report as indicating the correct full cash value of the subject property.

Both experts used the three accepted approaches to estimating value: (1) reproduction cost of the property, (2) income projected into the future (capitalization of income), and (3) market data appraisal, which is the comparison of sales of similar property. See *Mohave County v. Duval Corp.*, 119 Ariz. 105, 579 P.2d 1075 (1978). Neither expert accorded great weight to the market data appraisal. Klafter gave no estimate of value under this method due to the lack of comparable sales. Brown estimated the market value of the land only under this method to be $1,545,000.

The experts differed greatly in their appraisals under the other two methods. Under the reproduction cost approach, Klafter appraised the property at $4,500,000. Brown valued the property at $9,800,000 under this method. The principal difference was that Klafter deducted over $6,800,000 from his reproduction costs for "economic obsolescence." Economic obsolescence was defined by both experts as a loss in value caused by forces external to the property and outside the control of the property owner. Klafter's basic thesis was that the size of Levy's made it economically obsolete as a realty sales item, and his lower appraisals under both the reproduction cost and capitalization of income methods reflect this opinion. On direct examination, he testified:

"Q. Mr. Klafter, in the course of your investigation, study and analysis and your drawing upon your 40 years' experience, did you determine that there were any substantial uneconomic characteristics from the owners' point of view of this particular property?

A. Yes, I did.

Q. What in particular, sir?

A. I think that the size of the property is an uneconomic characteristic. I think it is—I guess you might use the term it is a white elephant because it is so large that if it was vacant, the other potential lessees are extremely limited.

The store is almost 300,000 square feet and today's department stores are built in—major department stores such as

Levy's are today sized at about 150,000 square feet, and if it were vacant today, for some unknown reason Federated and the owners terminated the lease, it probably would be leased so that a part of it was leased to an anchor tenant and the balance of it would have to be leased to other tenants. This would result in a less attractive anchor business as measured by shoppers and especially as measured by the mall tenants, the other tenants and the smaller tenants in the mall."

The record contains competent evident supporting Klafter's lower appraisals under the reproduction cost method.

Both experts agreed that the income capitalization method provided the preferred method of valuating the subject property. Moreover, both experts agreed on the capitalization rate of approximately 9.5%. Under the income method, using four different approaches, Klafter reached figures ranging from $5,600,000 to $6,100,000 as the full cash value of the property. Weighing the strengths and weaknesses of each approach, he estimated the value under this method at $6,000,000. Brown, on the other hand, estimated full cash value at $10,400,000 under the same method. These income capitalization estimates were equal to the final appraisal of the property in both the Klafter and Brown reports. The fundamental difference between the experts was that Klafter estimated a fair market rental value of $2.00 per square foot per year for the subject property, while Brown, using two different approaches, adopted $3.30 per square foot per year as fair market rental value.

Again, competent evidence supports the trial court's conclusion that Klafter's valuation under this method was correct and that Brown's was incorrect. Both experts reviewed comparable leases from around the country to arrive at their fair market rental figures. In reaching his fair market rental estimate of $2.00 per square foot per year, Klafter considered the alleged uneconomic size of the subject property, as he did under the reproduction cost approach. His appraisal report states:

"As the result of my entire investigation regarding this matter, I have concluded, and am of the opinion that, the store (Levy's) is just too big for one operation, and that no one would want to start out in a new market with a store of this size. This is the largest department store in the State of Arizona, and the largest that most shopping center experts have come in contact with. The modern trend is for smaller stores, in the 50,000 to 150,000 square foot range. The reason for this is that with more shopping centers, the market is fragmented, and it is necessary to attract enough business so that about $100 per square foot of sales can be produced. I am of the opinion that the tenant in the subject can produce sales of $100 per square foot, and that rents, on a percentage basis, would be no more than 1½% to 2% per square foot. This ties in closely with the median total rents per square foot found in typical national department chains of $1.90 per square foot."

In summary, the trial court was best able to judge the credibility and accuracy of both expert witnesses. Both appraisers presented impressive credentials and voluminous reports. The weight to be accorded expert testimony is within the sole province of the trial court, and since competent evidence supports its conclusion, we decline to intervene. *Harris Cattle Co. v. Paradise Motors, Inc.*, 104 Ariz. 66, 448 P.2d 866 (1968).

Appellants attack Klafter's appraisal on several other grounds. First, they argue that in valuing the Levy's property, appellees' expert did not take into account the leasehold interest along with the lessor's ownership interest. Appellants correctly recognize that in fixing the full cash value of land, the effect of existing leases on the value of to the owner should not be relied upon. *Caldwell v. Department of Revenue*, 122 Ariz. 519, 596 P.2d 45 (App.1979). In other words, the fact that a lease unfavorable to the owner encumbers the property does not lower its full cash value; the assessor must look instead to the fair market

rental value the land should command. See *Swan Lake Moulding Co. v. Department of Revenue*, 257 Or. 622, 478 P.2d 393 (1970), reh. den. 480 P.2d 713 (1971); *Crossroads Center (Rochester), Inc. v. Commissioner of Taxation*, 286 Minn. 440, 176 N.W.2d 530 (1970); *In re Property of Pine Raleigh Corp.*, 258 N.C. 398, 128 S.E.2d 855 (1963).

The record is clear that appellees' expert appraised the subject property on this basis. Klafter's fair market rental estimation was based on comparable rental information for major department stores across the country. Since he considered the combined value of both the owners' and the leasehold interest, his appraisal was lawful and correct.

Second, appellants contend Klafter did not valuate the property according to its current use, but as if it were "vacant." By using the word "vacant" in his testimony, however, it is obvious Klafter meant he appraised the property as if it were unencumbered by the present lease. As discussed above, this was the proper basis upon which to value the property.

Finally, appellants argue that since Levy's is a major "anchor tenant" of El Con shopping center and as such enjoys lower rental rates than smaller shops in the center, its assessed valuation should rise by a factor representing the higher rent the owners can charge the small shops because of the presence of Levy's. We disagree.

The New York Court of Appeals recognized the unique problems in assessing the value of "anchor" or "flagship" tenants within large shopping centers in *G. R. F., Inc. v. Board of Assessors*, 41 N.Y.2d 512, 362 N.E.2d 597, 393 N.Y.S.2d 965 (1977). In that case, the court recognized that because the reproduction cost method of appraisal would overvalue such property and the income capitalization method would result in a low valuation, a balancing or compromise of the two methods was proper. The court stated that the anchor tenant's presence in the shopping center "may have value apart from the income that use of the subject property would bring." 41 N.Y.2d at 513, 514, 362 N.E.2d at 599, 393 N.Y.S.2d at 967. The court was again faced with this issue in *Merrick Holding Corp. v. Board of Assessors*, 58 App.Div.2d 605, 395 N.Y.S.2d 233 (1977), rev'd 45 N.Y.2d 538, 382 N.E.2d 1341, 410 N.Y.S.2d 565 (1978). In *Merrick*, the Nassau County appraiser had added "leasehold bonuses" as theoretical income in increasing the valuation of anchor tenants in a large shopping center. The lower court struck down the valuation in the absence of proof of special circumstances, or proof that the leases were improvident when made. The court of appeals, reviewing the reduced assessment, reversed and held it was permissible for the taxing authorities to add "leasehold bonuses" to increase the valuation of the subject properties.

The result in *Merrick* has no application to the facts before us. The "leasehold bonuses" therein were calculated as "representing the differential between the actual rent and the market rent" for the major anchor tenants involved. *Merrick Holding Corp. v. Board of Assessors*, supra, 45 N.Y.2d at 543, 382 N.E.2d at 1343, 410 N.Y.S.2d at 568. As the lower court opinion made clear, the appraiser determined the amount of the bonuses "by comparative rentals paid *by the same or similar tenants in other shopping centers*." (Emphasis supplied) 58 App.Div.2d at 606, 395 N.Y.S.2d at 233. The "leasehold bonuses," then, represented the difference between the actual rent paid on the subject property and the fair market rental value of the property to other similar anchor tenants. No comparison is to be made to the smaller shopping center tenants which pay higher rents for the privilege of being located near a major department store. The question remains, then, whether appellees' expert properly based his appraisal on "comparable rentals paid by the same or similar tenants in other shopping centers." A review of his testimony and appraisal report indicates that he did. He testified:

"Q. Now, in the utilization of your income approach, which is the approach you say you gave most weight to? You first looked at comparable leases and a chart appears on page 72 of your report. Will you explain to the court, please, what the

purpose of that analysis was and what your conclusions were?

A. What I am aiming at and the reason for making this study was to estimate in my opinion what the fair market rental of Levy's Department Store would be. And to do that I obtained information regarding the rental of other department stores, which is shown in summary form on page 72.

And in addition to that I looked at the national averages and at the demographic or statistical material which is available in the Urban Land Institute publication, Dollars and Cents of Shopping Centers, and the reason I did that is this is an authoritative publication relied upon by experts in the field as well as by buyers, sellers and brokers and everyone who is interested in the shopping center field.

I was looking for information as it relates to department stores in what are called super regional shopping centers, which the El Con Shopping Center is. And this was also, you might say, educating myself or becoming aware of what goes on throughout the country so that I would know, in case the store was empty, I have to come up with an opinion what could it be rented for, and that is what I did, and that was the reason for my rental study.

Q. Now referring you to the summary chart on page 72, I would assume that you try to look at comparable information in close time proximity to January 1, 1979, as was available and try to look at those sales in which the size of the building was comparable?

A. Yes. Although I was not able to find any that was as large as Levy's.

Q. And under this comparable rental approach, you are limited to those instances in which there were actual sales as opposed to—

A. No.

Q. No?

A. Rents.

Q. Rents, as opposed to a situation where there may be a long-term lease which was not due or negotiated or subject to renewal anywhere near 1979?

A. No. I did not want any lease that was made in 1950 or '45 or anything like that. I wanted to measure the current marketplace; what are people doing today.

Q. So you were looking for those leases of stores which are as big as existed and as close in terms of date to January 1, 1979 as was available?

A. That's correct."

■ Appellees' expert properly valued the subject property on the basis of its fair market rental value as suited to a major anchor tenant. What the smaller shopping center tenants paid in rent has no bearing on the valuation of the subject property, which, unlike the situation in *Merrick Holding Corp. v. Board of Assessors*, supra, is assessed as a separate and distinct parcel from the rest of the shopping center.

## DISCOVERY MOTIONS

■ The trial court refused to compel appellees to answer interrogatories relating to the other tenants in El Con shopping center, including their average occupancy rate and the rents they paid. Appellants sought this information in order to justify the subject property's valuation under the anchor tenant theory discussed above. For the reasons stated above, this information was irrelevant and the court properly denied discovery.

■ Appellees filed a motion to compel the production of Brown's written appraisal report before trial. Appellants opposed the motion on the basis that Brown's report was protected from discovery by the work product rule. The trial court[1] ruled that appellees were entitled to the appraisal report and awarded them $150.00 attorney's fees. Appellants contend this ruling was incorrect and that the award of attorney's fees was an abuse of discretion. We disagree. This issue has been decided in favor of appellees in *State v. Whitman*, 91 Ariz.

1. The Honorable Jack G. Marks sat on this motion only.

120, 370 P.2d 273 (1962), and *United States v. Meyer*, 398 F.2d 66 (9th Cir. 1968). We see no abuse of discretion in the award of attorney's fees under these circumstances.

We have examined the other contentions of appellants and reach the conclusion that appellees met their burden of proof in showing that the county assessor's valuation of the subject property was incorrect and excessive. The fact that appellants chose to rely at trial on an expert appraisal higher than that of the assessor makes no difference. Appellees demonstrated and the trial court found that any valuation over $6,000,000 was excessive.

Affirmed.

HOWARD and BIRDSALL, JJ., concur.