187 P.3d 530

**EUROFRESH, INC., a Delaware corporation, fka Bonita Nurseries, Inc., a corporation, Plaintiff/Appellee,**

v.

**GRAHAM COUNTY, Defendant/Appellant.**

No. 1 CA–TX 06–0002.

Court of Appeals of Arizona, Division 1, Department T.

Oct. 25, 2007.

Reconsideration Denied Jan. 11, 2008.

Review Denied June 3, 2008.

Fennemore Craig, P.C. By Paul J. Mooney, Jim L. Wright, Paul Moore, Phoenix, Attorneys for Appellee.

Helm & Kyle, Ltd. By Roberta S. Livesay, Lisa J. Bowey, Tempe, Attorneys for Appellant.

## OPINION

JOHNSEN, Judge.

¶ 1 This is an appeal from a Tax Court decision granting a challenge to Graham County's assessments of the full cash value of a large hydroponic greenhouse in Willcox. The owner of the property, Eurofresh, Inc., challenged the County's assessments for tax years 2004 and 2005. During trial in the Tax Court, the parties generally agreed on the replacement cost of the greenhouse, but Eurofresh argued that the replacement cost should be reduced by 40 percent for *ad valorem* tax purposes because of external obsolescence. We hold that as a matter of law, proof of external obsolescence requires a showing of the cause of the asserted obsolescence and proof that it affects the value of the subject property. Because Eurofresh offered no such proof, we reverse the judgment of the Tax Court and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Eurofresh is the leading year-round producer and seller of greenhouse tomatoes in the United States. Although it has distribution centers at several locations throughout the country, Eurofresh operates greenhouses in only two locations, both in Arizona: the Willcox facility and another greenhouse in Snowflake that the company purchased in 2002. The greenhouses are hydroponic, meaning that the tomato plants are grown without soil.

¶ 3 The full cash value of real property is assessed as of January 1 of the preceding year. Ariz.Rev.Stat. ("A.R.S.") § 42–11001(15) (2003).[1] As of the January 1, 2003 valuation date for tax year 2004, Eurofresh owned 120 acres "under glass" in Willcox, and the County assessed the greenhouse at $36,229,693. Eurofresh added 48 acres of greenhouse in time for the January 1, 2004 valuation; for tax year 2005, the County valued Eurofresh's 168 acres of greenhouse at $51,884,078.

¶ 4 Eurofresh timely appealed the County's full cash value assessments for both tax years by filing complaints in the Tax Court.[2] After consolidating the appeals for the two tax years, the Tax Court held a nine-day bench trial.

¶ 5 Among the evidence at trial was a confidential offering memorandum issued by Banc of America Securities in April 2004 in connection with a $100 million loan to Eurofresh. According to the offering memorandum, in 2003 Eurofresh sold 80 million pounds of tomatoes grown in Arizona. The company's chief financial officer, Frank Van Straalen, testified that Eurofresh has a 20 percent share of the U.S. grocery-store greenhouse-tomato market. It is the largest U.S. supplier of greenhouse tomatoes; its Arizona operations give it 77 percent more productive acreage than its next largest com-

---

1. With the exception of A.R.S. § 42–11001, we cite the current versions of statutes throughout this decision because no revisions material to this decision have since occurred. We cite the 2003 version of section 42–11001 because the current version adds language that was not in effect at the time of the assessments. *See* 2006 Ariz. Sess. Laws, ch. 143, § 2 (2d Reg.Sess.).

The current version of the statute can be found at A.R.S. § 42–11001 (Supp.2006).

2. Eurofresh initially appealed to the Graham County Board of Equalization, which affirmed the assessor's assessment.

petitor in this country. According to the offering memorandum, the fact that Eurofresh is able to produce its greenhouse tomatoes year-round affords it "a unique competitive advantage." "As a result of year-round production, technologically advanced operations and premium positioning, Eurofresh believes it is the most consistently profitable hydroponic greenhouse tomato producer in North America."

¶ 6 Eurofresh's Willcox greenhouse is the largest of its kind in the world. Evidence at trial established that Willcox provides what Eurofresh calls an "ideal location" for its greenhouse. There it enjoys a "vast" supply of groundwater and abundant sunlight, "including the highest amount of winter sunlight in North America (average of 330 days of sunlight per year)." In addition, Willcox "provides cooler temperatures in the summer and frost in the winter, which helps the biological pest control program." According to the offering memorandum, "No other greenhouse competitor is able to generate a consistent, high volume supply of premium quality tomatoes throughout each month of the calendar year." This is a particularly valuable competitive advantage in the winter, when some competitors shut down and tomato prices rise. More than half of Eurofresh's projected revenues come from fixed-price purchase agreements with major U.S. grocers and "big-box" stores.

¶ 7 As Eurofresh described in its offering memorandum, the fresh produce market in the U.S. "is characterized by consistent underlying demand and favorable growth dynamics." Since 2000, the fresh tomato segment of that market experienced a 12 percent compounded annual growth rate. Greenhouse tomatoes represented 29 percent of the $2.5 billion average weekly grocery-store tomato sales. To take advantage of market growth, in 2004 Eurofresh was mapping a long-term plan to add up to 200 more acres of production capacity in Arizona.

¶ 8 At trial the County and Eurofresh agreed the most appropriate appraisal technique to apply to the Willcox greenhouse was the "replacement cost" method. As the Tax Court noted, both sides presented roughly equivalent estimates of the greenhouse's replacement cost. Both sides also agreed that when valuing real property using the cost method, one must take depreciation into account. According to Appraisal Institute, *The Appraisal of Real Estate* (12th ed.) (2001), which both sides agreed was authoritative, three categories of depreciation must be considered: physical depreciation, functional obsolescence and external (or "economic") obsolescence. *See id.* at 363–65.[3] The County and Eurofresh's expert appraiser witness, Paul Bierschwale, agreed that physical depreciation was minimal at the subject greenhouse and functional obsolescence was nonexistent. The parties vigorously disagreed, however, about whether the replacement cost of the greenhouse should be reduced on account of external obsolescence.

¶ 9 Eurofresh characterized its expert witness, Bierschwale, as a national expert in the appraisal of large (20+ acres) greenhouses, and the County did not seriously dispute Bierschwale's qualifications. Bierschwale testified that the replacement cost of the Willcox greenhouse should be reduced by 40 percent for property tax purposes because of external obsolescence. He arrived at that conclusion based on his study of three recent sales of smaller greenhouses, a 20–acre greenhouse in Snowflake,[4] a 20–acre greenhouse in Fort Lupton, Colorado, and a pair of 20–acre greenhouses (sold together) in Grant and Estancia, New Mexico.[5] Bierschwale calculated the replacement costs of each of the three greenhouses and compared those values with the prices for which they recently had sold. After adjusting for physical depreciation and other factors, Bierschwale con-

3. Throughout the trial, the parties and the court used the terms "external obsolescence" and "economic obsolescence" interchangeably.

4. This greenhouse was purchased by Eurofresh in 2002; the company subsequently refurbished the greenhouse and expanded it by 24 acres.

5. Bierschwale also considered a resale of the Estancia greenhouse that took place after the valuation date.

cluded that the three greenhouses had sold for between 40 and 58 percent less than their adjusted replacement cost. He attributed the differential to market-wide external obsolescence, and, on that basis, conservatively estimated that the replacement cost of the Willcox greenhouse should be reduced by 40 percent to arrive at its full cash value.

¶ 10 The County vigorously disputed Bierschwale's analysis. The County contended it was inappropriate to use the other greenhouse sales to calculate external obsolescence because each of the three greenhouses was in some way "distressed," each had been sold by a lender out of foreclosure or bankruptcy, and in fact, only one of the greenhouses was in operation at time of sale. More broadly, while not disputing that external obsolescence can be appropriately applied to a replacement cost analysis, the County argued that as a matter of law, Eurofresh failed to show that whatever external obsolescence that impaired the value of the other three greenhouses actually affected the value of the Willcox greenhouse.

¶ 11 The Tax Court found that Eurofresh had presented substantial competent evidence to overcome the presumption of correctness that attached to the County's valuations of the greenhouse for the tax years in question. It found that by failing to deduct from replacement cost for external obsolescence, the County had failed to correctly apply standard appraisal methods. The court noted Bierschwale's qualifications and adopted his conclusions, valuing the greenhouse at $22,291,500 for 2004 and $33,000,000 for 2005. Finally, the court awarded Eurofresh its reasonable attorney's fees, costs and expenses pursuant to A.R.S. §§ 12–348(B) and 12–332 (2003).

¶ 12 The County timely appealed the trial court's final judgment. We have jurisdiction pursuant to A.R.S. §§ 12–170(C) and 12–2101(B) (2003).

## DISCUSSION

¶ 13 The County argues that reducing replacement cost for external obsolescence without proof of the specific cause of the obsolescence and proof that it affects the subject property contravenes standard appraisal methods. Eurofresh counters that under standard appraisal methods, it is not necessary to identify a cause of external obsolescence when such obsolescence is market-wide. Thus, we are asked to decide whether a party seeking an adjustment in property value for *ad valorem* tax purposes based on external obsolescence must prove the cause, effect and quantity of such obsolescence. We hold that it must. Therefore, we reverse the Tax Court's conclusion as to full cash value and direct that court to reinstate the full cash value assessed by the County for the years 2004 and 2005, respectively, as $36,229,693 and $51,884,078.

### A. Standard of Review.

¶ 14 "We view the facts in the light most favorable to sustaining the trial court's judgment," *Cimarron Foothills Cmty. Ass'n v. Kippen*, 206 Ariz. 455, 457, ¶ 2, 79 P.3d 1214, 1216 (App.2003) (quoting *Sw. Soil Remediation, Inc. v. City of Tucson*, 201 Ariz. 438, ¶ 2, 36 P.3d 1208 (App.2001)), and will "defer to the trial court's factual findings as long as the record supports them," *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 198 Ariz. 330, 337, ¶ 15, 9 P.3d 1069, 1076 (2000). However, we review *de novo* pure questions of law and mixed questions of law and fact. *See Robson Ranch Mountains, L.L.C. v. Pinal County*, 203 Ariz. 120, 125, ¶ 13, 51 P.3d 342, 347 (App.2002).

### B. The Presumption in Favor of the County's Assessment.

¶ 15 Pursuant to A.R.S. § 42–13051 (2006), the County assessor annually determines the full cash value of all property within the county that is subject to taxation. " 'Full cash value' for property tax purposes means the value determined as prescribed by statute. If no statutory method is prescribed, full cash value is synonymous with market value which means the estimate of value that is derived annually by using standard appraisal methods and techniques." A.R.S. § 42–11001(5).

¶ 16 The valuation "as approved by the appropriate state or county authority is

presumed to be correct and lawful." A.R.S. § 42–16212(B) (2006). The taxpayer may overcome this presumption by presenting competent evidence that the taxing authority's valuation is excessive. *Inspiration Consol. Copper Co. v. Ariz. Dep't of Revenue,* 147 Ariz. 216, 219, 709 P.2d 573, 576 (App.1985), *superseded by statute on other grounds,* A.R.S. § 12–348(A) (2003), 1990 Ariz. Sess. Laws, ch. 360, § 1 (2d Reg.Sess.). "Evidence is competent for the purposes of rebutting the statutory presumption and of showing that the Department's valuation was excessive when it is derived by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved." *Id.* at 223, 709 P.2d at 580.

¶ 17 If the taxpayer uses a different valuation method than the taxing authority, the taxpayer's evidence is not competent unless it demonstrates that its method was appropriate under the circumstances. *Id.* at 219, 709 P.2d at 576. Conversely, if the taxpayer and taxing authority use the same appraisal method "but differ as to the correct treatment of factors utilized in such method, the taxpayer's evidence is nevertheless competent and sufficient to overcome the statutory presumption." *Id.*

¶ 18 The court may not independently value the property until the taxpayer presents competent evidence to rebut the statutory presumption that the taxing authority's valuation is correct. *Recreation Ctrs. of Sun City, Inc. v. Maricopa County,* 162 Ariz. 281, 285, 782 P.2d 1174, 1178 (1989); *Inspiration,* 147 Ariz. at 219, 709 P.2d at 576 (evidence must be competent). Thus, not only must the taxpayer show that the taxing authority's valuation is incorrect, the court also must find the taxing authority's valuation either excessive or insufficient before it may adopt the taxpayer's assertion as to the property's full cash value. *Recreation Centers,* 162 Ariz. at 285, 782 P.2d at 1178.

### C. External Obsolescence.

#### 1. The definition of external obsolescence.

¶ 19 Both parties used the replacement cost method ("cost approach" or "cost meth-

od") to calculate the value of the Willcox greenhouse. "In the cost approach, the appraiser compares the cost to develop a new property or a substitute property with the same utility as the subject property" to arrive at a value for the subject property. Appraisal Institute, *supra,* at 349.

¶ 20 According to the Appraisal Institute treatise, once a value is derived using the cost method, one or more other methods, including the market extraction method, may be used to estimate depreciation, including external obsolescence. *Id.* at 363. Once depreciation is calculated, it is subtracted from replacement cost to arrive at the full cash value.

¶ 21 The market extraction method of calculating depreciation, which Bierschwale employed in this case, analyzes sales of properties similar to the subject property. The appraiser subtracts each such property's adjusted sales price from its estimated replacement cost. The difference, expressed in a percentage of cost, represents depreciation. *Id.* at 389–92. Bierschwale concluded that because the three other greenhouses sold for between 40 and 58 percent less than their replacement costs, it was appropriate to reduce the replacement cost of the Willcox greenhouse by at least 40 percent to account for what he called market-wide external obsolescence.

¶ 22 *The Appraisal of Real Estate* defines "external obsolescence" to mean "a temporary or permanent impairment of the utility or salability of an improvement or property due to negative influences outside the property." Appraisal Institute, *supra,* at 363. The treatise further explains, "External obsolescence may be caused by economic or locational factors. It may be temporary or permanent, but it is not usually considered curable on the part of the owner, landlord, or tenant." *Id.* at 412. *See Ariz. Dep't of Revenue v. Questar S. Trails Pipeline Co.,* 215 Ariz. 577, 580, ¶ 12, 161 P.3d 620, 623 (App. 2007) (economic obsolescence is "a loss in value caused by forces external to the property and outside the control of the property owner" (quoting *Magna Inv. & Dev. Corp. v. Pima County,* 128 Ariz. 291, 293, 625 P.2d

354, 356 (App.1981))); Black's Law Dictionary 1107 (8th ed. 2004) ("Obsolescence that results from external economic factors, such as decreased demand or changed governmental regulations.").[6]

### 2. Application of external obsolescence.

¶ 23 As noted, the issue before the Tax Court was whether under Arizona law, A.R.S. § 42–11001, it was proper pursuant to standard appraisal methods to reduce replacement cost for external obsolescence without proof that the cause of such obsolescence affected the subject property. That issue is a mixed question of fact and law that we review *de novo*.

¶ 24 Although the County does not dispute that an appraiser using standard appraisal methods should consider the existence of external obsolescence, it contends that reducing a property's replacement cost for external obsolescence is not a standard appraisal method when the taxpayer cannot show that external obsolescence actually affects the subject property. In support, the County cites several Indiana tax court cases, including *Wal Mart Stores, Inc. v. Wayne Township Assessor*, 825 N.E.2d 485 (Ind. T.C. 2005), and *Heart City Chrysler v. Department of Local Government Finance*, 801 N.E.2d 215 (Ind. T.C.2004).[7] The County asserts that because there are no indications that Eurofresh's Willcox greenhouse suffered from external obsolescence, its full cash value for *ad valorem* property tax purposes is its replacement cost (adjusted only for physical depreciation).

¶ 25 For its part, Eurofresh asserts that the external obsolescence evidenced by the three other greenhouse sales is market-wide and for that reason, must necessarily affect the value of the Willcox greenhouse. It disputes that standard appraisal techniques require it to show a cause for external obsolescence observed elsewhere or prove that the cause actually affects the Willcox greenhouse.

¶ 26 We have found no Arizona cases addressing the legal standards that govern the application of external obsolescence to full cash value for *ad valorem* tax purposes. *See Questar*, 215 Ariz. 577, 161 P.3d 620 (when pipeline valuation statutes, A.R.S. §§ 42–14201 to –14204, provided exclusive method for calculating full cash value, external obsolescence need not be considered); *Magna Inv. & Dev. Corp.*, 128 Ariz. 291, 625 P.2d 354 (when taxpayer's expert testified that subject property, a department store space, was too large for modern-day leases, existence of legal link between asserted external obsolescence and subject property was not disputed).

¶ 27 Eurofresh objects to the County's suggestion that we rely on decisions of the Indiana tax court for guidance, but that court has written frequently on issues of obsolescence, and we recently looked to it for instruction on that topic. *See Questar*, 215 Ariz. at 580, ¶ 12, 161 P.3d at 623 (quoting Indiana court's definition of external obsolescence). In this case, we begin our analysis by looking again to the sound reasoning of the Indiana court on a matter of external obsolescence.

¶ 28 As the County argues, the Indiana cases apply a three-part test by which a taxpayer must prove obsolescence of any nature: (1) it must identify the cause of obsolescence; (2) it must quantify the amount of obsolescence; and (3) it must show that the subject property has suffered an actual loss of value due to the obsolescence. *See, e.g., Wal–Mart*, 825 N.E.2d 485; *Heart City*, 801

6. An Indiana court explained the possible causes of external obsolescence in this manner:

[E]conomic obsolescence (or a loss of value resulting from factors external to the property) could be caused by the fact that an improvement was located in an inappropriate area, subject to inoperative or inadequate zoning ordinances or deed restrictions, constructed for a need which has subsequently been terminated due to actual or probable changes in economic or social conditions, or the manufacture of the product for which the improvement was originally constructed has suffered from decreased market acceptability.
*Hometowne Assocs., L.P. v. Maley*, 839 N.E.2d 269, 273 (Ind. T.C.2005).

7. We note the correct name of the party in the first cited case is Wal–Mart, not Wal Mart, as it is spelled in the reporter. We will correctly spell the party's name in subsequent references to the case.

N.E.2d 215; *Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230 (Ind. T.C.1998), *abrogated on other grounds by Inland Steel Co. v. State Bd. of Tax Comm'rs*, 739 N.E.2d 201 (Ind. T.C.2000).[8]

¶ 29 At issue in *Wal Mart* were two stores, a standard-sized store that had been operating for some time, and a super-sized store built to replace the old store that was just about to open for business as of the valuation date. 825 N.E.2d at 486–87. The assessor valued both properties for tax purposes. The taxpayer appealed the assessments, arguing that both stores were entitled to deductions for obsolescence, the old store because it was to be demolished and the new store because it was not yet generating income. *Id.* at 488–89. The court denied the taxpayer's appeal, finding that even if the taxpayer was entitled to some measure of obsolescence, it had not offered proof of the amount of obsolescence to which it was entitled under standard appraisal methods. *Id.* 489–90. The court noted that when a taxpayer asserts that obsolescence affects its property, it must show "a connection to an actual loss in property value." *Id.* at 488. In a commercial property, the court said, "this loss of value usually means a decrease in the property's income generating ability." *Id.*

¶ 30 In *Heart City* the court explained that a taxpayer that sought an obsolescence adjustment "was necessarily required to explain its causes of obsolescence in order to translate its improvements' loss in value (due to those causes) into a quantifiable amount of obsolescence depreciation." 801 N.E.2d at 218. Put differently, the court stated:

> A taxpayer cannot quantify its obsolescence depreciation without relating the causes of obsolescence, and the actual loss in value to the improvement incurred as a result of those causes, to the amount of obsolescence it seeks.

*Id.* (citing *Clark*, 694 N.E.2d 1230). The court denied the taxpayer's appeal because it found that although the taxpayer's appraiser calculated a numerical obsolescence factor, he did not attribute the claimed obsolescence to any specific cause. *Id.* "Instead, Heart City presented an [a]nalysis concluding it was entitled to obsolescence depreciation based on a mathematical calculation bearing no relationship to causes of obsolescence depreciation alleged to exist." *Id.*

¶ 31 In *Clark*, the owner of an apartment building asserted the building suffered from obsolescence because it had inadequate parking and lacked an elevator. 694 N.E.2d at 1238. In rejecting the taxpayer's appeal, the court noted evidence that the building was almost fully occupied, from which it could be inferred that "the additional alleged causes of obsolescence did not cause the [property] to experience a loss in value, i.e., a loss of earning capacity." *Id.* at 1239. The court expressed its concern with obsolescence claims asserted without proof of a specific cause and a demonstrated effect:

> The administration of this state's property taxation system is best served by having taxpayers make detailed factual presentations of a given improvement's obsolescence.... For these reasons, this Court will not consider taxpayer complaints concerning obsolescence ... unless the taxpayer has identified the causes of the alleged obsolescence and presented probative evidence that would support a quantification of obsolescence at the administrative level.

*Id.* at 1241. *See Indian Indus., Inc. v. Dep't of Local Gov't Fin.*, 791 N.E.2d 286, 289–90 (Ind. T.C.2003) (given requirement that taxpayer must prove by way of "probative evidence that ... factors are causing an *actual* loss of value to its property," taxpayer's claim for more external obsolescence failed when record was "completely devoid of any evidence indicating and explaining [proper-

8. While we adopt the analytical reasoning of the Indiana court, we note that the standard of review imposed in the cited cases is significantly different from that applied by our Tax Court. *Compare, e.g., Wal Mart*, 825 N.E.2d at 487 ("This Court gives great deference to final determinations of the Indiana Board.") with *Magna*, 128 Ariz. at 293, ¶ 1, 625 P.2d at 356 (notwithstanding statutory presumption of correctness, Tax Court may make independent valuation of full cash value if taxpayer presents evidence to rebut the presumption and court determines that valuation is excessive or insufficient).

ty's] actual loss of value"); *Deer Creek Developers, Ltd. v. Dep't of Local Gov't Fin.*, 769 N.E.2d 259, 263 (Ind. T.C.2002) (taxpayer's burden was "to present probative evidence showing the cause" of alleged external obsolescence); *Pedcor Invs.–1990–XIII, L.P. v. State Bd. of Tax Comm'rs*, 715 N.E.2d 432, 437 (Ind. T.C.1999) (in valuation challenge brought by owner of public housing project, which argued that external obsolescence resulted from deed restrictions that required leasing to low-income tenants, federal tax incentives also must be taken into account "when evaluating whether the deed restrictions do, in fact, cause the apartment complex to experience economic obsolescence").

¶ 32 Courts in other jurisdictions have imposed much the same proof requirements in analyzing taxpayers' assertions of external obsolescence. In *Higbee Co. v. Cuyahoga County Board of Revision*, 107 Ohio St.3d 325, 839 N.E.2d 385 (2006), for example, the taxpayer's appraiser calculated external obsolescence by subtracting a "market" rent he calculated based on comparable leased properties from the amount of rent required for a reasonable return on the subject property. *Id.* at 393. The court affirmed the tax board's rejection of the taxpayer's calculation because the taxpayer had not demonstrated that the rental properties its appraiser had used "to develop a market rent are indeed comparable to the subject property." *Id.* (citing differences in size and market area between subject property and proposed comparables). Similarly, in *Alta Pacific Associates, Ltd. v. Utah State Tax Commission*, 931 P.2d 103 (Utah 1997), the court rejected a tax appeal by the owner of an apartment building operated under federal housing programs for elderly and poor. Although the taxpayer had sought a 31 percent reduction in value due to external obsolescence, it "failed to describe how each regulatory restriction impacted" income from the property. *Id.* at 113.

¶ 33 A Kansas court likewise rejected a taxpayer's claimed external obsolescence re-

duction in a property tax case that like this one, involved an uncommon property. At issue in *Sunflower Racing, Inc. v. Board of Commissioners of Wyandotte County*, 256 Kan. 426, 885 P.2d 1233 (1994), was a newly constructed racetrack designed for both horse- and dog-racing. The owner of the track had sought a 75 percent reduction in value based on sales of a handful of other tracks. The court accepted the taxing authority's conclusion that because the comparables involved distressed sales, meaning the other tracks were "in financial difficulty," "idleness or bankruptcy," they were "not a credible indicator of economic obsolescence." *Id.* at 1236, 1244.

¶ 34 Finally, a South Dakota court affirmed a tax board's decision rejecting a taxpayer's claimed external obsolescence based on sales of "comparable" properties when the subject property enjoyed environmental attributes superior to the comparables. The issue in *National Food Corp. v. Aurora County Board of Commissioners*, 537 N.W.2d 564 (S.D.1995), was the valuation of heavy farm equipment taxed as real property. As the court held, quoting the tax board, "Because of environmental factors, and labor-available labor, available land, available feed stuffs, and other reasons, . . . a location like this probably is the best location that [the taxpayer] could build on." *Id.* at 569.

¶ 35 These authorities together teach that a taxpayer claiming external obsolescence must prove both the cause of the asserted obsolescence and that the subject property is actually affected by that cause. Nevertheless, Eurofresh argues that the Tax Court's finding that Bierschwale employed standard appraisal methods puts an end to the matter. The company argues that because Bierschwale used the cost method and the market extraction method, both of which are standard appraisal methods, his opinion was necessarily sufficient to overcome the presumption in favor of the County's assessed value.[9]

---

9. Similarly, Eurofresh argues that its 40 percent deduction for obsolescence is merely a treatment of an element within a standard appraisal method. *See Inspiration*, 147 Ariz. at 223, 709 P.2d at 580 ("Evidence is competent for the purposes of

rebutting the statutory presumption . . . when it is derived by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved.").

¶ 36 We conclude Eurofresh's argument is misplaced because the issue is not whether one computation of external obsolescence should be chosen over another but instead, whether, as a matter of law, the external obsolescence Bierschwale testified he observed in the other three greenhouses he studied actually affects the greenhouse at issue. Put differently, the issue here is not about how to apply an appraisal method but whether to apply it.[10]

¶ 37 As the Tax Court observed during trial, no Arizona court has yet established the legal requirements for proving that a property's value for *ad valorem* tax purposes has been impaired by external or economic obsolescence. We hold that, as a matter of law, a taxpayer claiming external obsolescence must offer probative evidence of the cause of the claimed obsolescence, the quantity of such obsolescence, and that the asserted cause of the obsolescence actually affects the subject property.

¶ 38 Our conclusion is based not only on the authorities cited above but also on the appraisal treatise relied upon by both sides' experts. *The Appraisal of Real Estate* permits the use of the market extraction method to calculate depreciation, including external obsolescence. Appraisal Institute, *supra*, at 389–92 (describing the market extraction method as a means of calculating depreciation) and 363 ("depreciation" includes external obsolescence). But the treatise warns that the market extraction method should be used only when the comparable properties relied upon "have incurred similar amounts and types of depreciation" as the subject property. *Id.* at 391. It explains:

When sales data is plentiful, the market extraction method provides a reliable and convincing estimate of depreciation. However, the comparable properties should have similar physical, functional, and external characteristics as the subject, and they should have incurred similar amounts and types of depreciation.

When the comparable properties differ in design, quality, or construction, it is difficult to ascertain whether differences in value are attributable to these differences or to a difference in depreciation. The market extraction method is also difficult to apply when the type or extent of depreciation varies greatly among the comparable properties.

*Id.*[11]

¶ 39 It seems to us that the treatise's warning that market extraction requires that the subject property have similar "amounts and types" of obsolescence as the comparables used to calculate obsolescence is a reflection of the concern that underlies the rule applied by courts in Indiana and the other jurisdictions discussed above. It is not sufficient, these authorities teach, to simply assert that a property's value should be reduced because of external obsolescence observed elsewhere. Particularly when, as here, a taxpayer calculates obsolescence based on other "comparable" properties, the taxpayer must prove that the subject property actually is affected by the obsolescence seen in the other properties.

### 3. Application of the correct legal standard to the valuation of the Willcox greenhouse.

¶ 40 As noted above, after gathering data to substantiate the replacement cost of the Willcox greenhouse, Bierschwale, on behalf of Eurofresh, examined recent sales of three other greenhouses. Only one of the three greenhouses was operating as of the date of the sale, and one of the other two was in very rundown condition. Even so, and although all three were sold by lenders after foreclosures and had been on the market for more than a year, Bierschwale testified that

---

10. We noted in *Questar* that obsolescence is a factor to be addressed when applying standard appraisal methods, 215 Ariz. at 579, ¶ 12, 161 P.3d at 622, but did not hold in that case that reducing a valuation due to obsolescence would be appropriate when the taxpayer has not established the cause of the purported obsolescence or that it affects the subject property.

11. In relating how the market extraction method is performed, the first step described by the treatise is "Find and verify sales of similarly improved properties that appear to have incurred a comparable amount of depreciation as the subject property." Appraisal Institute, at 389.

all three sales were "arms' length" and each fetched the best available price in the applicable market.

¶ 41 At trial and on appeal, the County argued that Bierschwale's use of the market extraction method was inappropriate in part because the three greenhouses on which he relied were so dissimilar to the Willcox greenhouse that the sales were not comparable.[12] Bierschwale, however, testified that he adjusted the sales price of each greenhouse to account for dissimilarities. For example, he adjusted upward the sales price of the greenhouse that was in disrepair to account for necessary refurbishment costs. Given his testimony, we will defer to the Tax Court's implicit conclusion that Bierschwale adequately performed the mechanical adjustments required by this step of the market extraction method.[13]

¶ 42 Nevertheless, even accepting as true Bierschwale's conclusion that the three other greenhouses sold for at least 40 percent less than their replacement value, Eurofresh failed to offer sufficient proof of the cause of the external obsolescence assertedly seen in the other properties or that external obsolescence actually affected the Willcox property. The company offered no evidence that its Willcox greenhouse in fact had incurred (in the language of the treatise) "similar amounts and types" of external obsolescence as the three other greenhouses that formed the basis of the company's economic obsolescence calculations. Instead, its appraiser simply asserted that the Willcox greenhouse must have incurred external obsolescence because he observed external obsolescence in the other greenhouses.

¶ 43 At trial, Bierschwale initially declined to offer any reason for the external obsolescence he said he calculated from the other sales; instead, he testified simply that "the market indicates" the existence of the obso-

lescence. He continued, "That's the beauty of the market is that the market does the indicating and the appraiser does not specifically have to identify those factors.... [T]here's no requirement that we come up with a specific reason why some phenomenon exists in the market, which the market tells us."

¶ 44 During Eurofresh's rebuttal case, Bierschwale testified that it "would be impossible to identify all of" the causes of external obsolescence when the obsolescence affects an entire market. He testified that among such factors were "barriers to entry," which he said meant that it "costs a lot of money to get into" the greenhouse vegetable business. He identified another factor he called "grower capability," meaning expertise in the greenhouse vegetable industry, expertise he said is relatively rare in the United States. Another barrier to entry that causes external obsolescence in a tomato greenhouse, he said, is the requirement, due to the crop's relatively brief life, that a producer have sale contracts lined up in advance. Bierschwale did not purport to link any of the market factors he identified to Eurofresh's Willcox greenhouse.

¶ 45 On appeal, Eurofresh offers no explanation for the cause of the external obsolescence that Bierschwale testified he observed in the other greenhouses. It argues instead that his testimony that he followed standard appraisal methods in calculating obsolescence is sufficient, by itself, to prove that the value of the Willcox greenhouse should be reduced on account of obsolescence. As stated above, we reject Eurofresh's contention that the value of a property for *ad valorem* tax purposes may be reduced because of external obsolescence in the absence of proof of the cause of the purported obsolescence, quantification of the obsolescence, and proof that the

12. When sales comparables are used, "many factors including but not limited to the climatic, economic, and population patterns of the comparables should be examined to insure that they are sufficiently comparable to the property in question when the comparables are distant from the property at issue." *Maricopa County v. Sperry Rand Corp.*, 112 Ariz. 579, 581 n., 544 P.2d 1094, 1096 n. (1976).

13. The County also disputed Bierschwale's characterization of the three sales as "arms' length," given that each greenhouse was sold by a lender after many months on the market. Although the County's contentions might prevail under other circumstances, on this record, we defer to the Tax Court's finding that the sales were in fact arms' length.

obsolescence has in fact affected the subject property.

¶ 46 The facts of this case demonstrate the logic of the rule that we adopt. Even accepting as true Bierschwale's conclusion that the other three greenhouses sold for at least 40 percent below their adjusted replacement cost, Eurofresh offered no evidence that its Willcox greenhouse suffered from the same impairment. Bierschwale and Van Straalen both conceded that under the company's valuation theory, the Willcox greenhouse lost 40 percent in value immediately upon completion of construction, but they were unable to offer any explanation of how or why that might be so.[14]

¶ 47 Moreover, *The Appraisal of Real Estate,* whose authority Bierschwale acknowledged, teaches that external obsolescence is either temporary or permanent, yet Bierschwale offered no opinion whether the "market-wide" external obsolescence he observed in the other sales was one or the other. Without proof that purported external obsolescence is either temporary or permanent, the trier of fact cannot determine whether obsolescence calculated from past sales comparables might affect a subject property's current value.

¶ 48 Pressed on rebuttal to state some cause for the external obsolescence he testified was market-wide, Bierschwale ultimately offered a handful of possible causes, *supra* ¶ 43. Asked whether Eurofresh suffered from any of those difficulties, however, Bierschwale testified that none of them afflicted Eurofresh. That he failed to attribute to the Willcox greenhouse any of the market factors he identified is no surprise given the superior performance Eurofresh has reaped from that greenhouse. *See supra* ¶¶ 5–6 (*inter alia,* production from the company's Willcox greenhouse has made it the top year-round greenhouse tomato producer in the nation). When, for example, the company boasts that more than 50 percent of its production is subject to fixed-price contracts, it can hardly be said that it suffers from a shortage of reliable markets.[15] Bierschwale effectively conceded that whatever may have caused the external obsolescence he observed in the other sales might not affect the Willcox property when he testified on cross-examination that it "certainly, possibly might happen sometimes" that market factors that exist in some locations do not exist in other locations or at other times.

¶ 49 Finally, Eurofresh offers no legal authority, and we have found none, approving application of an external obsolescence factor derived entirely from other sales using the market extraction method that Bierschwale employed to calculate full cash value for *ad valorem* tax purposes. In other words, in no other case that we have located has a court approved reducing a subject property's replacement cost because of external obsolescence calculated solely from data relating to other properties.[16] When a taxpayer

14. Asked at trial what became of the roughly $21 million represented by the 40 percent reduction in value he attributed to the greenhouse, Bierschwale testified that as the owner of the greenhouse, Eurofresh experienced an increase in its "business value" to the same extent.

15. As noted, Eurofresh itself was the buyer of one of the three greenhouses on which Bierschwale based his external obsolescence opinion. Bierschwale did not explain how it could be that, under the ownership of Eurofresh, the Snowflake greenhouse would experience inept management or other barriers to entry that he testified might have caused the external obsolescence he calculated based in part on the Snowflake greenhouse sale price. In fact, the evidence offered concerning Eurofresh was to the contrary; that its management, superior expertise, superior facilities and fixed contracts are among the strengths that make it successful and secure its dominant place in the business.

16. Asked during oral argument for any case authority that supported the approach that Eurofresh's appraiser took in this case, its counsel cited only *Meridian Towers East & West v. Washington Township Assessor,* 805 N.E.2d 475 (Ind. T.C.2003), and *Canal Square Ltd. Partnership v. State Board of Tax Commissioners,* 694 N.E.2d 801 (Ind. T.C.1998). In neither case, however, did the court endorse the application of external obsolescence calculated from comparable sites, let alone grant such a deduction in value when the taxpayer was unable to identify the cause of the obsolescence or offer proof that the subject property was likewise affected. In *Meridian Towers,* the court noted that the taxpayer and the assessor "*agreed that causes* of obsolescence existed" within the subject property. 805 N.E.2d at 478 (emphasis added). Moreover, the taxpayer in that case quantified the purported obsolescence by comparing the replacement cost of the subject property with a capitalization value calculated based on income data from the same

seeks a reduction in the full cash value of its own property based on such a calculation, reason and logic demand that it prove that the specific factors that caused the obsolescence observed in the comparable properties also affect the subject property. Because Eurofresh offered no such evidence in this case, we must reverse the Tax Court's judgment adopting the company's proposed full cash value.

### CONCLUSION

¶ 50 For the foregoing reasons, we reverse and remand the Tax Court's judgment and direct that on remand, the court affirm the

property, not, as here, based on data from other properties. *Id.* at 479. In *Canal Square*, the taxpayer's appraiser testified about specific causes of the external obsolescence he attributed to the subject property. 694 N.E.2d at 806 (presence of an electrical power station on the site; excessive construction features per city code).

County's valuation of the Willcox greenhouse for tax years 2004 and 2005. We also reverse the Tax Court's award to Eurofresh of its attorney's fees and costs.

CONCURRING: JON W. THOMPSON and SUSAN A. EHRLICH, Judges.

Moreover, as in *Meridian Towers*, the appraiser quantified external obsolescence by comparing the subject building's replacement cost with the subject building's capitalized value. *Id.* at 806–07. For these reasons, the cases on which Eurofresh relies have little relevance to the valuation of the Willcox greenhouse.