131 P.3d 958 (2006)
NORTHWEST PIPELINE CORPORATION, Appellant,
v.
ADAMS COUNTY, Benton County, Chelan County, Clark County, Cowlitz County, Franklin County, Grant County, Grays Harbor County, King County, Kittitas County, Klickitat County, Lewis County, Lincoln County, Mason County, Pierce County, San Juan County, Skagit County, Skamania County, Snohomish County, Spokane County, Thurston County, Walla Walla County, Whatcom County, Whitman County, Yakima County, and Washington Department of Revenue, Respondents.
No. 23635-8-III.
Court of Appeals of Washington, Division 3.
April 13, 2006.
William C. Severson, William C. Severson, PLLC, Norman J. Bruns, Attorney at Law, Seattle, WA, David J. Crapo, Wood, Crapo, LLC, Salt Lake City, UT, for Appellant.
David M. Hankins, Heidi A. Irvin, Attorney Generals Office/Revenue Div, Olympia, WA, for Respondents.
*959 SWEENEY, C.J.
¶ 1 Counties in this state tax the assets of utilities based on property values determined by the Washington State Department of Revenue. Northwest Pipeline Corporation paid its property taxes under protest and then sued for a partial refund for the 2001 tax year. The superior court upheld the Department's calculations of value and affirmed the property tax assessments of the counties. Northwest Pipeline appeals. We conclude that the findings of fact underlying the trial court's decision are well supported by this record, and we therefore affirm.

FACTS
¶ 2 Northwest Pipeline operates a natural gas pipeline that runs through seven western states including Washington. Northwest is a wholly-owned subsidiary of Williams Gas Pipeline Company, which in turn is a wholly-owned subsidiary of The Williams Companies, Inc. Williams Companies is a diversified, conglomerate holding company with multiple business interests including telecommunications, coal, and energy trading.
¶ 3 The Federal Energy Regulatory Commission (FERC) regulates Northwest. FERC fixes the rates Northwest can charge its customers and regulates the acquisition and abandonment of facilities. FERC limits Northwest's earnings to its operating expenses plus a reasonable return. This is called the "rate base." Exs. 6, 26. FERC determines the rate primarily from the financial report (FERC Form 2) Northwest files annually.
¶ 4 The Counties[1] assess annual property taxes based on the value of Northwest's property in Washington as calculated by the Department of Revenue (Department). The Department uses a methodology set out in chapter 458-50 of the Washington Administrative Code. And that methodology calls for three separate valuations using three different approaches  market value, income, and cost. These three values are then weighted and reconciled to arrive at what is called the "system value." See Clerk's Papers (CP) at 179-80. We briefly describe each approach since they help explain this controversy.
¶ 5 1. Market Value. This is, as the name implies, the market value of the company. Calculating market value was complicated here by a number of factors. First, Northwest is a second-tier subsidiary. Williams Companies is highly diversified and is publicly traded (providing ready access to a market value). Northwest is not publicly traded. And Northwest operates in several states other than Washington. So the Department first valued the entire multi-state system. It then extrapolated the value of Northwest's interstate system from that of the parent company, Williams Gas Pipeline. But in reconciling the three approaches (market, income, cost), the Department ultimately gave no weight to market value.
¶ 6 2. Income. The second approach uses the utility's projected cash flow for the coming year. The Department assumed an annual growth rate of 2 percent. The validity of this assumption is one of the primary points of contention in this case. Northwest contends the growth rate should be zero, because it is a regulated company and FERC regulations assure no growth. That is, FERC allows rate increases solely to accommodate obsolescence and expansion in the system for new customers, neither of which results in an expansion of cash flow. A 2 percent growth rate results in a taxable value of $949.6 million. CP at 183 (finding of fact 25).
¶ 7 The income approach derives value by application of a formula  V=CF/(K-G). V is the value the Department is trying to derive. CF is the company's cash flow. K is a constant; it represents the cost of capital. And G is the expected growth rate of the company. This formulaic approach to deriving a value based on income is not disputed. Part of the dispute centers on the Department's assumption of a 2 percent growth *960 rate. A zero growth rate would lower the value of Northwest's assets to around $782.5 million or some $167.1 million less than the value assuming a 2 percent growth rate. Report of Proceedings (Vol.II) (RP) at 176-77; CP at 184 (finding of fact 27); Ex. 23 at 47-25.
¶ 8 3. Cost Approach. The third method is the traditional accounting approach of cost-less-depreciation. The Department took a standard mechanical approach to cost. It simply used the numbers for cost and depreciation reflected in Northwest's balance sheets. This gives rise to Northwest's second major contention. It claims that the Department's approach to the depreciation values did not sufficiently account for obsolescence. Using a market-based approach to obsolescence, the true taxable value of its assets, Northwest claims, would be $787,215,099, or $161,236,827 less than the Department's assessment.[2]
¶ 9 Reconciling the costs and income approach to value, the Department set the value of Northwest's assets at $949.6 million. Northwest's 2002 property taxes levied by the Counties were based on the Department's 2001 valuation. Northwest paid the taxes under protest and appealed to the superior court. The court upheld the tax. And Northwest appeals.

DISCUSSION

ASSUMPTION OF A 2 PERCENT GROWTH RATE
¶ 10 Northwest objects to the Department's assumption of a 2 percent growth rate on a number of grounds. First, Northwest contends that a regulated company cannot experience growth because their growth is regulated. And a regulated company cannot raise its rates without applying to FERC and FERC allows rate increases only to accommodate increased costs. Therefore, there is never any "growth," as in comparable unregulated companies. Assuming that a utility can increase its operating income only by increasing its rates, Northwest concludes that the growth rate should have been zero. Northwest argues that there is no substantial evidence, independent of the state's assumption, suggesting a 2 percent growth rate. And finally Northwest contends that a 2 percent growth rate violates the Department's own rule prohibiting taxation of assets that do not exist as of the lien date. That is, assuming growth effectively taxes assets that by definition will be created in the future (future growth).
¶ 11 The Counties rely heavily on Northwest's statutory burden to persuade the court by clear, cogent, and convincing evidence that the Department's valuation is wrong. RCW 84.40.0301. But that burden (a burden of persuasion) is not a helpful tool here on appeal. Burden of proof can be divided into two tasks  a burden of production and a burden of persuasion. See, e.g., Renz v. Spokane Eye Clinic, P.S., 114 Wash. App. 611, 618, 60 P.3d 106 (2002). The burden of persuasion defines the degree of certainty with which the fact finder must decide the issues. In re Det. of Skinner, 122 Wash. App. 620, 629, 94 P.3d 981 (2004) (citing 2 JOHN W. STRONG, McCORMICK ON EVIDENCE § 336 (5th ed.1999)), review denied, 153 Wash.2d 1026, 110 P.3d 213 (2005).
¶ 12 But on appeal we are concerned with the burden of production  the substantial evidence test. State v. Dolan, 118 Wash. App. 323, 331, 73 P.3d 1011 (2003). Whether the burden of persuasion has been met is for the finder of fact. Renz, 114 Wash.App. at 623, 60 P.3d 106. Our application of the substantial evidence test is not influenced by the burden of persuasion. Here, we will affirm if we find substantial evidence in the record from which the trial court could reasonably have found a growth rate of 2 percent.
¶ 13 The test for substantial evidence is modest. There must be more than "a mere scintilla" of evidence. It is sufficient if it "`would convince an unprejudiced thinking mind of the truth of the fact'" to which the evidence is directed. Davis v. Microsoft Corp., 149 Wash.2d 521, 531, 70 P.3d 126 (2003) (emphasis omitted) (quoting Thomson v. Virginia Mason Hosp., 152 Wash. 297, 300-01, 277 P. 691 (1929)).
*961 ¶ 14 Contrary to Northwest's assertion, the 2 percent rate is not a bald assumption unsupported by the evidence. This record provides ample support for a 2 percent growth rate. According to Northwest's own corporate 10-year plan, the Pacific Northwest will experience an overall economic growth rate of between 2 percent and 3.3 percent between 2001 and 2010. The plan predicts that Washington's rate of population growth will far exceed the national average (1.3 percent for Washington versus 0.8 percent nationally). Moreover, Northwest also expected the per capita consumption of gas to rise. This results in a 10-year plan prediction of an increase in demand for natural gas in Northwest's area of operations of 2.2 percent. By 2004, Northwest expected its pipeline volume to increase significantly. The record shows that Northwest and its parent companies planned major facilities expansions to accommodate this anticipated growth. Northwest's operating profits were projected to increase by 6 percent.
¶ 15 Finally, Northwest's own historical data shows that its operating income over the past 10 years has grown at a compound annual rate of 2 percent. Ex. 22 at B-1; Ex. 23 at B-1; Ex. 24 at A-3. Short term, the corporate prediction was for "[b]ullish growth initiatives and opportunities" forming "the foundation of the 2001 annual plan." Ex. 10 at 1.
¶ 16 All of this is substantial evidence that supports a finding of a 2 percent growth rate. Microsoft Corp., 149 Wash.2d at 531, 70 P.3d 126.
¶ 17 A second premise underlying Northwest's argument against a 2 percent growth rate is that Northwest's rates are regulated by FERC and regulated rates are static. Said another way, only unregulated rates increase. But "growth rate" refers to expanded cash flow, not increased rates (rate of growth, not growth of rate). Northwest's accountants projected future revenue based on contract terms (which are influenced by FERC regulation) and transported volumes (which are not). The Department relied on Northwest's own reports to FERC and the Securities and Exchange Commission (SEC) in determining the impact of regulation on value. CP at 188 (unchallenged finding of fact 40).
¶ 18 Moreover, Northwest exerts some control over rates. Its 10-year growth strategy specifically called for officially maintaining rate stability by staying "out of rate cases until at least 2003." Ex. 9 at 24. Northwest's parent, Williams Gas Pipeline, calls itself "an industry leader in regulatory reform," actively pursuing favorable rate strategies under the existing regulations. Ex. 9 at 4. This evidence is inconsistent with Northwest's assertions of a regulatorily induced stasis.
¶ 19 Finally, Northwest argues that the practical effect of applying a 2 percent growth rate is to tax property that does not exist now but will only exist in the future. And this is contrary to the Department's own policies. It is true that the taxed properties must be in existence on the date of the assessment. But it is the future income stream that is assessed. WAC 458-50-080(2)(B)(i). And that future income stream has a present value. Moreover, the Department's enabling act and its own regulations require it to consider prospective earnings in valuing utilities. RCW 84.12.300; WAC 458-50-080(2)(B)(i).
¶ 20 Ultimately, appraising the value of a pipeline utility  or any business for that matter  is not an exact science. It is an exercise in professional judgment. This record reflects that the trial judge respected all the experts here. Ultimately, however, the court regarded their disagreement as evidence of the variability in the range of professional appraisals. That assessment is well supported by this record, particularly when we begin with a legal presumption that the Department's property valuation is correct. RCW 84.40.0301.

DEPRECIATION ESTIMATES
¶ 21 Northwest next argues that the Department understated losses due to depreciation by using the traditional book depreciation. Northwest contends that book depreciation does not account for all forms of obsolescence, including functional and economic obsolescence.
*962 ¶ 22 The Counties respond that the Department simply adopted the depreciation used by Northwest in its annual FERC and SEC reports. The depreciation reported in these reports is defined by regulation. This includes general obsolescence and particular market-based forms of functional and economic depreciation such as "changes in the art," changes in demand, and exhaustion of natural gas supplies. 18 C.F.R. pt. 201, def. 12.B (2001).
¶ 23 Northwest's expert, Laren Gertsch, testified that FERC regulations define depreciation to include "`wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public utilities, and [in the case] of natural gas companies, the exhaustion of natural resources.'" RP (Vol.I) at 86. Mr. Gertsch agreed that this was consistent with what FERC actually looked at. He testified that FERC depreciation accounted for "whatever factors are out there . . . regardless whatever type they are." RP (Vol.I) at 107.
¶ 24 We agree with the trial court that it was reasonable, given the number and size of property appraisals performed, for the Department to adopt the depreciation numbers generated by a utility's own accountants in accordance with federal standards. And any discrepancy could be accommodated in the process of reconciling the multiple values obtained by the Department. The court correctly found that no additional obsolescence deduction was required. Again, that finding is supported by the evidence.

HOLDING
¶ 25 We affirm the decision confirming the Department of Revenue's value of Northwest's assets and the trial court's judgment for the defendants.
WE CONCUR: KATO and BROWN, JJ.
NOTES
[1] Adams County, Benton County, Chelan County, Clark County, Cowlitz County, Franklin County, Grant County, Grays Harbor County, King County, Kittitas County, Klickitat County, Lewis County, Lincoln County, Mason County, Pierce County, San Juan County, Skagit County, Skamania County, Snohomish County, Spokane County, Thurston County, Walla Walla County, Whatcom County, Whitman County, and Yakima County (hereafter the Counties).
[2] Appellant's Br. at 11.