NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TRANSWESTERN PIPELINE COMPANY,
*Plaintiff/Appellee*,

v.

ARIZONA DEPARTMENT OF REVENUE, et al.,
*Defendants/Appellants*.

No. 1 CA-TX 19-0006
FILED 8-6-2020

Appeal from the Arizona Tax Court
No.  TX2016-000931
TX2016-000951
(Consolidated)
The Honorable Christopher T. Whitten, Judge

**AFFIRMED IN PART; VACATED IN PART; REMANDED WITH
INSTRUCTIONS**

COUNSEL

Mooney, Wright & Moore, PLLC, Mesa
By Paul J. Mooney, Paul Moore, Jim L. Wright
*Co-Counsel for Plaintiff/Appellee*

Norton, Rose, Fulbright US, LLP, Houston, TX
By Andrew P. Price
*Co-Counsel for Plaintiff/Appellee*

Arizona Attorney General's Office, Phoenix
By Lisa A. Neuville, Jerry A. Fries, Nancy K. Case
*Counsel for Defendants/Appellants*

---

## MEMORANDUM DECISION

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Jennifer M. Perkins joined.

---

**M O R S E**, Judge:

¶1   The Arizona Department of Revenue ("Department") appeals from the tax court's entry of judgment in favor of Transwestern Pipeline Company, LLC ("Transwestern"). For the following reasons we affirm in part, vacate in part, and remand for proceedings consistent with this decision.

### FACTS AND PROCEDURAL BACKGROUND

¶2   Transwestern owns approximately 2,500 miles of natural gas pipeline that crosses five states, including Arizona (the "Property"). In Arizona, the pipeline spans Apache, Coconino, Maricopa, Mohave, Navajo, Pinal, and Yavapai Counties, and those counties tax the Property based on values determined by the Department. At all times relevant to this case, Transwestern was a wholly-owned subsidiary of Energy Transfer Partners ("ETP"), and was regulated by the Federal Energy Regulatory Commission ("FERC").

¶3   This case arises out of the valuation of Transwestern's Property for ad valorem tax purposes. After a revision, the Department assessed the full cash value of the Arizona portion of the Property at $639,690,000 for the 2016 tax year and at $614,375,000 for the 2017 tax year ("revised valuations"). Transwestern filed complaints in tax court claiming the Department's assessments improperly exceeded the Property's market value. The tax court consolidated the cases. After discovery, the Department filed "error corrected" full-cash values of $743,266,000 for the 2016 tax year and $712,891,000 for the 2017 tax year ("error-corrected valuations"). At summary judgment, the tax court rejected the error corrected valuations.

¶4   The court held an eight-day bench trial, recording over a thousand pages of testimony. The trial centered on the testimony and reports of Transwestern's expert Robert Reilly ("Reilly") and the Department's expert Brent Eyre ("Eyre"). Transwestern presented three

other witnesses, including a rebuttal expert, Hal Heaton. Reilly and Eyre conducted appraisals of Transwestern and filed extensive reports. Both experts conducted their appraisals through a unitary valuation in which they first determined the value of all Transwestern property, then removed non-taxable property, and allocated the taxable value of property located in Arizona. *See* A.R.S. § 42-14204(H)(1). The parties stipulated at trial to allocation factors of 54.9872% and 54.4233% for tax years 2016 and 2017, respectively.

¶5 Both experts estimated the market value of Transwestern based on a hypothetical arms-length transaction between a willing buyer and seller. For his market value appraisals, Reilly used income and cost methods. Similarly, Eyre used income, cost, and market data methods. Both experts reconciled their results by assigning a weight to each valuation method to establish the market value of the Property. The following table summarizes the Department's revised valuation, error-corrected valuation, the market values proposed by both experts, and the market-value determination of the tax court, for each tax year:[1]

| Tax Year | Dep'ts Revised Statutory Value | Dep'ts Error-corrected Statutory | Reilly's Market Value | Eyre's Market | Tax Court's Market Value |
|---|---|---|---|---|---|
| | | | | | |
| 2016 | 639,690,000 | 743,266,000 | 362,000,000 | 774,942,735 | 402,861,521 |
| 2017 | 614,375,000 | 712,891,000 | 368,000,000 | 733,987,070 | 392,264,642 |

¶6 The tax court issued a seven-page ruling detailing its findings and conclusions. In general, the court found that "[e]ach party presented compelling evidence related to the fair market value of the Property" but expressed that Reilly's qualifications were more impressive than Eyre's. In valuing the Property, the tax court accepted Reilly's overall unit valuations, but rejected Reilly's exclusion of certain intangible assets,[2] and allocated the values as stipulated. The tax court found that the fair market value of the Arizona portion of the pipeline was $402,861,521 and $392,264,642 for tax years 2016 and 2017, respectively, and entered judgment in favor of Transwestern. The Department timely appealed, and we have jurisdiction pursuant to A.R.S. § 12-170(C) and -2101(A)(1).

---

[1] The table's values are allocated to Arizona using each valuer's allocation factor.

[2] Inclusion of the intangible assets amounted to approximately $5 million and is not disputed on appeal.

**DISCUSSION**

¶7        The Department asks us to reverse the tax court's decision and values and instead recognize the Department's values.  We address three issues in this appeal.  First, whether competent evidence supports the tax court's values based on Reilly's income approach.  Second, whether the court erred when it accepted Reilly's reduction based on economic obsolescence in the cost approach.  Finally, whether the court erred when it rejected the Department's error-corrected valuations.

## I.        Legal Principles.

¶8        In reviewing a judgment entered after a bench trial, we view the evidence in the light most favorable to upholding the tax court's decision.  *Eurofresh, Inc. v. Graham County*, 218 Ariz. 382, 385, ¶ 14 (App. 2007).  We will sustain the tax court's findings of fact "unless they are clearly erroneous.  A finding of fact is not clearly erroneous if substantial evidence supports it[.]"  *Kocher v. Ariz. Dep't of Revenue*, 206 Ariz. 480, 482, ¶¶ 8-9 (App. 2003) (citations omitted).  We review mixed questions of law and fact de novo.  *Eurofresh*, 218 Ariz. at 385, ¶ 14.  Whether an appraisal technique is proper pursuant to standard appraisal methods is a mixed question of law and fact reviewed de novo.  *Id.* at 387, ¶ 23.

¶9        Arizona taxes property at its full cash value determined by either a statutory method of valuation, if provided, or by standard appraisal methods.  A.R.S. § 42-11001(6); *Nordstrom, Inc. v. Maricopa County*, 207 Ariz. 553, 556, ¶ 9 (App. 2004).  Arizona law provides a statutory valuation formula for pipelines.  *See* A.R.S. §§ 42-14201 to -14204.  But full cash value, "shall not be greater than market value regardless of the method prescribed to determine value for property tax purposes."  A.R.S. § 42-11001(6).[3]  Fair market value is defined as the "amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the

---

[3]        From 1989 to 2006, the pipeline statutory formula was "the exclusive method for calculating full cash value."  *Ariz. Dep't of Revenue v. Questar S. Trails Pipeline Co.*, 215 Ariz. 577, 580-81, ¶¶ 14, 19 (App. 2007) (citation omitted); *see also* 1989 Ariz. Sess. Laws, ch. 33, § 2 (1st Reg. Sess.).  In 2006, the legislature amended A.R.S. § 42-11001 to provide that full cash value cannot exceed market value.  *See* 2006 Ariz. Sess. Laws, ch. 143, § 2 (2nd Reg. Sess.).  Prior to 1989, full cash value was synonymous with market value.  *See SFPP, L.P. v. Ariz. Dep't of Revenue*, 210 Ariz. 151, 153, ¶ 9 (App. 2005).

relevant facts." *Bus. Realty of Ariz., Inc. v. Maricopa County*, 181 Ariz. 551, 553 (1995) (quoting *Fair Market Value*, Black's Law Dictionary (6th ed. 1990)).

¶10            "Value, like beauty, is often defined by the eye of the beholder. It is incapable of being calculated with mathematical precision and therefore necessarily must be estimated." *Ariz. Dep't of Revenue v. Trico Elec. Coop., Inc.*, 151 Ariz. 544, 549 (1986). The tax court must begin with the factual presumption that the Department's valuations are "correct and lawful." A.R.S. § 42-16212(B); *see Dep't of Prop. Valuation v. Trico Elec. Coop., Inc.*, 113 Ariz. 68, 70 (1976). "The taxpayer may overcome this presumption by presenting competent evidence that the taxing authority's valuation is excessive." *Eurofresh*, 218 Ariz. at 386, ¶ 16. Evidence is competent for this purpose if derived "by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved." *Id.* (citation omitted). The three standard appraisal methods are market data, income, and cost. *See Maricopa County v. Sperry Rand Corp.*, 112 Ariz. 579, 581 (1976). Transwestern had the dual burden to rebut the statutory presumption and show that a lower valuation is correct. *Graham County v. Graham Cnty. Elec. Coop., Inc.*, 109 Ariz. 468, 469-70 (1973). On appeal, we review whether the tax court's decision was based on competent evidence. *See Magna Inv. & Dev. Corp. v. Pima County*, 128 Ariz. 291, 293 (App. 1981).

## II.    Income Methods.

¶11        The Department challenges three aspects of Reilly's income methods: the capitalization rate, the reduction of revenue to account for income taxes, and the income forecasts.

### A.    Capitalization Rate.

¶12        The Department first challenges Reilly's capitalization rate ("WACC") as inflated based on an unsupported company-specific risk premium. According to the Department's calculations, the tax court's decision to include the additional premium increased the cost of equity which in turn substantially decreased the estimated market value of Transwestern under the income approach. The Department also noted that Reilly's WACC exceeds the FERC maximum rate of return and was "wildly inconsistent with the WACC" used by other Transwestern valuations and that this inconsistency is attributable to the company-specific risk premium.

¶13        For his 2016 valuation, Reilly used the average of three models to estimate the cost of equity component of the WACC: two modified capital asset pricing models ("CAPM"), and the dividend growth

model.[4] Reilly did not use the dividend growth model in his 2017 valuation due to data constraints and thus relied solely on the CAPMs. In a CAPM, the cost of equity is calculated using the risk-free rate, the equity-risk premium, and the industry beta. Beta measures the risk of the overall market and when valuing a privately held company it is commonly calculated using the average beta of publicly traded companies in the same industry. Shannon Pratt, *The Lawyer's Business Valuation Handbook* 122-23 (2000) [hereinafter Pratt 2000]. Reilly developed a WACC of 10.2% and 9.8% for the 2016 and 2017 tax years, respectively. Eyre used WACCs of 7.11% and 7.8%.

**¶14** Reilly's cost of equity included a small-company risk premium of 1.8% in 2016 and 2% in 2017, and a company-specific risk premium of 3%. In his report, Reilly identified risks associated with Transwestern, including: (1) low marketability, (2) few potential buyers, (3) high transaction costs, and (4) limited diversity of operations. At trial, Reilly testified that the company-specific risks in this case involved "depreciating assets," a "lack of diversification," a "lack of liquidity," and dependence on a "key customer." Eyre, by contrast, concluded that neither the company-specific risk premium nor the small-company risk premium was warranted. The tax court found Reilly's analysis, which "included both premiums in the calculation of his [WACC], to be more credible."

**¶15** The Department's main argument is that the company-specific risks duplicate the risks already accounted for in the small-company risk premium and the industry beta. Specifically, the Department asserts there is no evidence in the record that Transwestern uniquely suffered from the identified company-specific risks—illiquidity, key customer dependence, and depreciating assets—while other companies in the pipeline industry do not. The Department also argues that Reilly failed to provide sufficient factual basis for the premium; either specific financial analysis to determine whether a company-specific risk premium is appropriate or the amount of such a premium.

**¶16** Citing Reilly's testimony, Transwestern argues that the company-specific risk premium is a standard appraisal method. The Department does not dispute that an appraiser using standard appraisal methods could consider company-specific risks, but it stresses that the

---

4       *See generally Minn. Energy Res. Corp. v. Comm'r of Revenue*, 886 N.W.2d 786, 794-95 (Minn. 2016) (discussing capital asset pricing model); *Union Pac. R. Co. v. Dep't of Revenue*, 843 P.2d 864, 880-81 (Or. 1992) (discussing dividend growth model).

evidence must still show risks specific to the company, above general risks to the entire industry.

¶17        "[T]he cost of equity capital is not capable of [] mathematical precision . . . and in fact is a judgment call, enlightened by consideration of all the relevant factors." *Litchfield Park Serv. Co. v. Ariz. Corp. Comm'n*, 178 Ariz. 431, 437 (App. 1994) (citation omitted). However, the company-specific risk premium is controversial. *See* Kenneth Ayotte & Edward R. Morrison, *Valuation Disputes in Corporate Bankruptcy*, 166 U. Pa. L. Rev. 1819, 1829 (2018) ("Empirical finance research provides evidence against the existence of company-specific risk premia in the real world."). Courts have noted that, "[t]o judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick." *Del. Open MRI Radiology Assoc., P.A. v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006). Thus, those proposing such adjustments "must overcome some level of baseline skepticism founded upon judges' observations over time of how parties have employed the quantitative tool of a company-specific risk premium." *In re Sunbelt Beverage Corp. S'holder Litig.*, C.A. No. 16089-CC, 2010 WL 26539, at *12 (Del. Ch. Jan. 5, 2010) (as revised). A company-specific risk premium can be appropriate only "to the extent that the company has risk factors that have not already been reflected in the general equity risk premium as modified by [the industry] beta and the small company size premium." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1157-58 (Del. Ch. 2006) (quoting Pratt 2000 at 125); *see also CNB Int'l, Inc. v. Kelleher* (*In re CNB Int'l, Inc.*), 393 B.R. 306, 320 (Bankr. W.D.N.Y. 2008) (noting company-specific risks are duplicative of small-company risks unless the "particular circumstances indicate a business having risks other than those that would be associated with its status as a smaller enterprise."), *aff'd on other grounds*, 440 B.R. 31 (W.D.N.Y. 2010).

¶18        Because the taxpayer bears the dual burden of producing competent evidence to overcome the statutory presumption that the Department's valuation is correct *and* to support a lower valuation, Transwestern must support its assertion of a company-specific risk with fact-based evidence. *Graham Cnty. Elec. Coop.*, 109 Ariz. at 469-70. On appeal, we review de novo whether an appraisal technique is proper and need not accept the tax court's findings based upon an improper method. *Eurofresh*, 218 Ariz. at 386-87, 390, ¶¶ 17, 23, 36; *see also Graham Cnty. Elec. Coop.*, 109 Ariz. at 471 (rejecting expert's use of the capitalization-of-income method when valuing non-profit utility). Although we do not reweigh the evidence, we need not defer to the tax court's conclusion based on Reilly's testimony when we cannot find competent record evidence that

Transwestern specifically suffered from the specific risk factors accepted by the court. *See Pima County v. Cyprus-Pima Mining Co.*, 119 Ariz. 111, 119 (1978) (finding expert's capitalization-of-income method was not competent evidence when he departed from projected copper prices and failed to adjust for inflation); *cf. Magna Inv. & Dev.*, 128 Ariz. at 294 ("[S]ince competent evidence supports [the tax court's] conclusion, we decline to intervene[.]").

**¶19**    First, we agree with the Department that there is no reasonable dispute that all pipelines are depreciating assets. Transwestern provides no evidence that it suffers more depreciation than any other pipeline company. *See Sunbelt Beverage*, 2010 WL 26539, at *13 (concluding that "risks to everyone in the industry . . . are not risks that merit inclusion of a company-specific risk premium."); *see also Minn. Energy Res. Corp. v. Comm'r of Revenue*, 886 N.W.2d 786, 793 (Minn. 2016) (noting the "tax court excluded a company-specific risk factor from its calculation of MERC's cost of equity based on a lack of evidentiary support in the record for the proposition that MERC's business was riskier than the market"). Because Transwestern bears the burden of providing such evidence, it was error to add a company-specific risk premium based on depreciation. *See Graham Cnty. Elec. Coop.*, 109 Ariz. at 469-70.

**¶20**    As for key-customer dependence, Reilly testified that Transwestern's "largest customer by far is BP. BP accounts for over 15 percent of their revenue in each year." He also testified that "[t]he top 10 customers account for over two thirds of the revenue of Transwestern." But we again agree with the Department that there is no evidence in the record that Transwestern uniquely suffered from these risks in comparison to others in the pipeline industry. The record thus fails to show that this factor does not duplicate the adjustment already contemplated in the industry beta. This distinguishes the cases cited by Transwestern, which included evidence of *company-specific* risks. *See Blue Book Servs., Inc. v. Amerihua Produce Inc.*, 337 F. Supp. 3d 802, 816-17 (N.D. Ill. 2018) (denying summary judgment to exclude company-specific risk premium when calculating reduction in value due to alleged company data breach); *Estate of Giustina v. Comm'r.*, 111 T.C.M. (CCH) 1551, 2016 WL 3264351, at *5 (T.C. 2016) (permitting a company-specific risk premium when valuing 41% interest in a limited partnership when partnership agreement restricted the sale of the interest to other limited partners); *Buchwald v. Renco Group*, 539 B.R. 31, 41, 43-44 (S.D.N.Y. 2015) (allowing a company-specific risk premium to account for company's needed technology changes and inability to pay its debt); *Keach v. U.S. Trust Co. N.A.*, 313 F. Supp. 2d 818, 853-54 (C.D. Ill. 2004) (noting that experts agreed on applicability of a company-specific risk

premium due to dependency on sweepstakes marketing and finding expert advocating for smaller premium more persuasive).

¶21 The parties spend a good deal of their briefing disputing the liquidity factor. Reilly testified that "lack of liquidity" was one of the company-specific factors but Transwestern's rebuttal expert, Hal Heaton, admitted that "[l]iquidity is a part of the [small-company] size premium." Other courts have recognized this redundancy. *See Gearreald v. Just Care, Inc.*, No. 5233-VCB, 2012 WL 1569818, at *11 (Del. Ch. Apr. 30, 2012) (finding the size premium captures the fact that smaller companies tend to be less liquid). Eyre also criticized this factor, noting that Transwestern is a subsidiary of a large publicly-traded company and a premium for liquidity "undermines shareholder value" and violates the market value premise of a willing buyer/seller because ETP would not accept such an adjustment. Reilly denied that the two premiums were duplicative because the small-company premium only accounts for small publicly traded companies.

¶22 But liquidity, like the remaining alleged company-specific factors—diversification, marketability, few potential buyers, and high transaction costs—are all factors associated with Reilly's valuation of Transwestern as a private, rather than a public, company. The record contains no persuasive authority that standard appraisal practices permit a privately held company to include a company-specific risk premium because it is privately held. *Cf.* Richard Brealey et al., *Principles of Corporate Finance* 476 (10th ed. 2011) (discussing calculation of the WACC for valuing a privately held company without referencing a company-specific risk premium); Ayotte & Morrison, *supra*, at 1829 (noting that evidence does not support small private companies receiving a company-specific risk premium even where lack of diversification is a valid concern). Therefore, we are not persuaded by this justification for the inclusion of a company-specific risk premium. *See Eurofresh*, 218 Ariz. at 390, ¶ 36 (holding that on appeal this Court will review, as a matter of law, whether to apply a particular appraisal method).

¶23 It was Transwestern's burden to show that the company-specific risk premium was "appropriate under the circumstances." *Id.* at 386, ¶ 17. Transwestern failed to carry that burden. Accordingly, we must vacate and remand for the tax court to redetermine an appropriate WACC based on the evidence presented and without a company-specific risk premium.

### B.    Reduction for Income Tax.

**¶24**        The Department also argues that Reilly's income-approach methods are not competent because, even though Transwestern does not pay any income tax, he reduced Transwestern's income by assuming an annual federal and state income tax liability of 39%. The tax court made no specific findings regarding Reilly's income reduction to account for income tax. On appeal, we must determine whether the taxpayer presented competent evidence that supports the tax court's decision. *See Magna Inv. & Dev.*, 128 Ariz. at 293; *see also Cyprus-Pima Mining Co.*, 119 Ariz. at 114 (reviewing whether sufficient evidence supports the court's valuation when its "findings of fact provide us with little, if any, basis as to why the court found the State's valuation to be excessive").

**¶25**        The parties do not dispute that, as pass-through entities, neither Transwestern nor its parent company, ETP, directly pay any federal income tax on Transwestern's revenue. Instead, as a Master Limited Partnership ("MLP"), any tax liability would fall to ETP's individual partners. *See generally Inquiry Regarding the Commission's Policy for Recovery of Income Tax Costs*, 81 Fed. Reg. 94366-01, 9366-67, ¶¶ 4-7 (Dec. 23, 2016) (describing MLP business model).

**¶26**        To calculate income, Reilly started with the net operating income Transwestern reported to FERC on its FERC Form 2. The net operating income reflects a reduction for accrued deferred income tax liability, which is the difference between the amount of taxes collected in rates and the taxes actually paid. *See* FERC, *Cost-of-Service Rates Manual* 11 (June 1999). Although Transwestern's cash income is higher, "[i]n essence, ratepayers are prepaying the income taxes and the pipeline will have use of these extra dollars until it has to pay more income taxes in subsequent years as its taxable deduction for depreciation decreases." *Id.*

**¶27**        Instead of using Transwestern's net operating income, which accounts for the deferred income taxes, Reilly calculated Transwestern's earnings before income and taxes ("EBIT") and then reduced the EBIT by the full 39% tax rate. This resulted in what Reilly called a "normalized income" that was lower than Transwestern's net operating income. Reilly used this normalized income to determine Transwestern's value.

**¶28**        On appeal, the Department contends that the deferred taxes should be included in the calculation of income but does not specifically address Reilly's "normalization" which decreased Transwestern's net

operating income by the full tax rate. We find the record supports both deductions.

**¶29**        First, when calculating income to determine value for property tax purposes, courts have looked to the pipeline's net operating income. *See In re Colonial Pipeline Co.*, 347 S.E.2d 382, 384 (N.C. 1986) (noting both experts "capitalized projected net operating income"); *N. Nat. Gas Co. v. Comm'r of Revenue*, 8864-R, 2019 WL 2490771, at *13-14, *50-53, *13 n.84 (Minn. T.C. June 4, 2019) (utilizing net operating income reported on FERC Form 2 when pipeline accrued deferred income taxes). Although Transwestern paid no income tax, it accumulated a deferred income tax liability. The deferred taxes are not income for FERC purposes and Transwestern does not earn a rate of return on investments made with this money. *See* FERC, *Cost-of-Service Rates Manual* 12 (June 1999); *see also Pac. Power & Light Co. v. Dep't of Revenue*, 775 P.2d 303, 305 (Or. 1989) (explaining that "property purchased in this way actually costs the utility nothing, so no return needs to be earned on that property."). The deferred income taxes are effectively an interest free loan. *See* Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications & Examples* 538 n.25 (5th ed. 2014) ("Most regulatory commissions consider deferred income taxes part of the capital structure but typically allow a zero rate of return on the amount on the basis that the account is equivalent to a no-cost loan."). Therefore, the net operating income reported on Transwestern's FERC Form 2 was competent evidence for use in the income methods.

**¶30**        Second, the record reflects that Reilly's additional reduction was "appropriate under the particular circumstances[.]" *Eurofresh*, 218 Ariz. at 386, ¶ 16. Reilly provided several justifications for this normalization, including that Transwestern's "members are subject to income tax related to the [Transwestern] income." Brad Whitehurst, Executive Vice President of Tax for ETP, explained that different ETP partners are subject to different taxation levels "because some are enjoying the benefit of depreciation because they're new partners. The older partners aren't." This aspect of partnership law supports Reilly's normalization. *See ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 954 (D.C. Cir. 2007) ("[I]nvestors in a [MLP] are required to pay tax on their distributive shares of the partnership income, even if they do not receive a cash distribution."). Finally, we note that other states have performed similar calculations when valuing MLP owned pipelines. *See Enbridge Energy, Ltd. P'ship v. Comm'r of Revenue*, 8858-R, 2019 WL 2853133, at *26-28 (Minn. T.C. June 25, 2019) (applying "sound appraisal judgment" to deduct imputed income taxes instead of only taxes actually paid), *aff'd in part, rev'd in part on other grounds*, __ N.W.2d __, 2020 WL 3818130 (Minn. 2020).

¶31 Moreover, Eyre admitted in his deposition that taxes had to be accounted for because the owners of ETP pay taxes. At trial, Eyre's criticism of Reilly's approach was limited to two statements that the normalization was "different from the reality of Transwestern." But that was not in dispute. Critically, Eyre's review appraisals did not address Reilly's reduction of additional income taxes or argue that Reilly's normalization violated standard appraisal techniques.

¶32 Our role is not to determine the preferred method for calculating Transwestern's income. *See Navajo County v. Four Corners Pipe Line Co.,* 106 Ariz. 511, 522 (1970) ("[I]t is not the function of the judiciary to promulgate tax assessment regulations in the form of judicial opinions."). Because our record in this case reflects that Transwestern met its burden to present competent evidence, we affirm the tax court's calculation of Transwestern's income for use in the income methods.

### C. Discrepancies with Other Reports Prepared by Transwestern.

¶33 At trial, the court admitted two other valuations of Transwestern, conducted by BVA Group and KMPG. The purpose of these valuations was not for use in this case. According to the tax court, BVA Group and KMPG "arrive[d] at conclusions that tend to support [the Department's] valuation." The Department argues that Reilly used artificially low income forecasts when compared to KPMG and BVA.

¶34 Although the tax court found the disparity between these valuations and Reilly's "troubling," the court concluded that BVA Group and KMPG sought to evaluate the "fair value," not the "fair market value," of Transwestern and "[a]lthough there is only one word of difference in the titles of the two types of evaluations, there is a world of difference between the two." The record thus indicates that the court considered the KPMG and BVA Group reports but gave them little weight. That the tax court did not weigh the evidence or interpret it in a manner favorable to the Department does not indicate that the court either ignored it or did not understand it.

## III. Cost Approach and Economic Obsolescence.

¶35 The Department also argues that Transwestern failed to provide sufficient evidence to support Reilly's cost approach. Specifically, the Department contends that Transwestern's evidence failed to meet the strict requirements to show economic obsolescence and alternatively

contends that Reilly's methodology for calculating the obsolescence was flawed.

**¶36**		Both experts applied a cost approach and performed the historical cost less depreciation ("HCLD") method. HCLD is "sometimes referred to as 'net book value'." Western States Association of Tax Administrators, *Appraisal Handbook: Unit Valuation of Centrally Assessed Properties* II-8 (2009). The tax court noted that both experts obtained "very similar opinions of the [HCLD] of the unit." Both experts opined that the unportioned HCLD for the 2016 and 2017 tax years was approximately $1.8 billion. The experts differed on whether the value should be reduced for obsolescence. Reilly determined that additional deductions of 59% and 60% were needed to account for economic obsolescence for tax years 2016 and 2017, respectively.

**¶37**		In property valuations, "[o]bsolescence, a form of depreciation, is defined as a loss of value and is classified as either functional or economic." *Nordstrom*, 207 Ariz. at 559, ¶ 27. This Court has defined economic obsolescence as "a loss in value caused by forces external to the property and outside the control of the property owner." *Ariz. Dep't of Revenue v. Questar S. Trails Pipeline Co.*, 215 Ariz. 577, 580, ¶ 12 (App. 2007) (quoting *Magna Inv. & Dev.*, 128 Ariz. at 293). The term is also defined as "a temporary or permanent impairment of the utility or salability of an improvement or property due to negative influences outside the property." *Eurofresh*, 218 Ariz. at 386, ¶ 22 (quoting Appraisal Institute, *The Appraisal of Real Estate* 363 (12th ed. 2001)).

**¶38**		This Court addressed the application of economic obsolescence to property valuations in *Eurofresh.* We held that to establish the existence of economic obsolescence, a taxpayer must offer probative evidence of (1) the cause of the obsolescence, (2) the quantity of the obsolescence, and (3) that the asserted cause of the obsolescence actually affects the subject property. *Eurofresh*, 218 Ariz. at 390, ¶ 37.

**¶39**		As a threshold matter, we note that Reilly obtained his values to calculate the HCLD from Transwestern's FERC fillings. The Department contended at trial that the HCLD already includes economic obsolescence as a form of depreciation because obsolescence is included in the definition of depreciation for FERC purposes. *See* 18 C.F.R. pt. 201, subpt. 12 (2020) (including "obsolescence" and "changes in demand" in the definition of "depreciation"); *see also Nw. Pipeline Corp. v. Adams County*, 131 P.3d 958, 962 (Wash. Ct. App. 2006) (holding that pipeline was entitled to "no additional obsolescence deduction" beyond that used "in its annual FERC and SEC

reports"). Because the Department did not address this issue on appeal we assume, without deciding, that the use of economic obsolescence in this case was not duplicative. *See Calpine Const. Fin. Co. v. Ariz. Dep't of Revenue*, 221 Ariz. 244, 250, ¶ 31 (App. 2009) (holding issues not addressed in briefing are waived).

### A.    Cause of Economic Obsolescence.

**¶40**        Transwestern's witnesses identified several external forces causing economic obsolescence: (1) the increased cost of labor and material during construction of the "Phoenix lateral"[5] (from anticipated costs of $711 million to $870 million in actual costs), (2) the economic downturn during the 2008-2009 recession decreased demand, (3) the decreased price of natural gas, and (4) competition from green energy. As Reilly conceded, "[t]here's no 1 factor . . . in this case that caused economic obsolescence."

**¶41**        The tax court found that "Transwestern has proved through the testimony of its witnesses and expert that the value of the Property suffered from economic obsolescence." Specifically, the court noted that the massive cost overruns and dramatic downturns in the economy, with related decrease in demand, resulted in obsolescence.

**¶42**        The Department counters that the decision to build the Phoenix lateral, and the resulting cost overruns, were not "external" factors and could have resulted from poor management decisions. The Department also alleges the testimony of Transwestern's witnesses contradicted each other. For example, Whitehurst, who started working for Transwestern in 2014, acknowledged that Phoenix is growing but less than expected. And Beth Hickey, ETP Senior Vice President for Interstate Natural Gas, testified that Transwestern experienced decreased utilization after 2008, but utilization was so high in 2014 that it invested $24.5 million in a compression station to increase the capacity on the Phoenix lateral. Then, after Transwestern built the New River compression station it was used for less than "100 hours" each year. The Department concludes that

---

[5]        The "Phoenix lateral" was a pipeline project proposed in late 2005 to connect Transwestern with the Phoenix Metropolitan Area. An application for its construction was filed with FERC in 2006 and construction began in 2007. It was completed in 2009 with a capacity of 500MMcf/d. In 2013, Transwestern built the New River compression station, at the cost of $24.5 million, which increased the Phoenix Lateral's capacity to 660MMcf/d.

Transwestern's own actions in expanding capacity to handle more business contradicts its claim of obsolescence.

¶43 Conflicting evidence does not affect the competency of a valuation method, "[r]ather[] it is a factor that the [fact finder] must weigh in its analysis." *Trico*, 113 Ariz. at 70. We "defer to the tax court's factual findings if the record supports them." *100 Val Vista/Montgomery LLC v. Pinal County*, 247 Ariz. 50, 54, ¶ 14 (App. 2019). The record supports the tax court's finding that the 2008-2009 recession was a "negative influence" on the Property's value. *See Eurofresh*, 218 Ariz. at 386, ¶ 22. Economic conditions are a recognized source of economic obsolescence. *See Four Corners*, 106 Ariz. at 515 (noting "economic obsolescence is the decrease in value of the pipe-line in servicing those areas for which it was intended to be used"); *Eurofresh*, 218 Ariz. at 387, ¶ 22 n.6 (noting that economic obsolescence can be caused by "actual or probable changes in economic or social conditions." (quoting *Hometowne Assocs., LLP v. Maley*, 839 N.E.2d 269, 273 (Ind. T.C. 2005))); *see also* ADOR, *Assessment Procedures Manual* 2.1.16-.17 (Effective March 1, 2011) (identifying example of economic obsolescence as "changes in the economy that create changes in supply or demand for properties like the subject").

¶44 Accordingly, competent evidence supports the tax court's finding that the Property experienced economic obsolescence.

## B. Quantity of Economic Obsolescence.

¶45 Reilly arrived at his external obsolescence estimate by using the capitalization of income loss method. According to Reilly's report, in the capitalization of income loss method, economic obsolescence is estimated by comparing the Transwestern profitability measures (with economic obsolescence) to selected profitability measures (without economic obsolescence). The difference between these two profitability measures—the income loss—represents the amount of economic obsolescence.

¶46 The first analysis Reilly conducted to quantify the economic obsolescence was to compare the recent rates of return with historical rates of return. Reilly noted that Transwestern's rate of return "decreased substantially following the construction of the Phoenix lateral pipeline. This occurred due to factors related to this construction project as well as industry-wide factors (such as increasing competition and decreasing demand)." For tax year 2015, Reilly used the returns from 2004 to 2006 as his benchmark and compared the earnings with 2010 to 2014. Reilly found

that Transwestern earned returns on investment 50% to 60% less than they were earning pre-recession and pre-Phoenix lateral. From this he calculated an estimated obsolescence of 56%. For tax year 2017, he calculated an estimated obsolescence of 55%.

¶47 The second analysis Reilly conducted to quantify the economic obsolescence was a comparison to guideline pipeline companies. *See Eurofresh*, 218 Ariz. at 390, ¶ 39 (discussing how a taxpayer may calculate "obsolescence based on other 'comparable' properties"). Reilly compared Transwestern's rate of return to the return of six pipelines of a similar size and age that operate in the southwestern United States. Specifically, Reilly selected the pipelines with the highest returns. Reilly reasoned that using the highest returns as the benchmark allowed him to compare Transwestern to companies that have the least amount of economic obsolescence. From this he calculated an estimated obsolescence of 62% for 2016 and 64% for 2017.

¶48 Reilly averaged the two estimates to reach his calculations of economic obsolescence.

¶49 The Department asserts numerous criticisms of Reilly's analysis, but those arguments go to the weight of evidence, not its admissibility. The weight given expert testimony is within the sole province of the tax court. *Magna Inv. & Dev.*, 128 Ariz. at 294.

## C. Actual Effect on the Property.

¶50 Citing *Eurofresh*, the Department argues that the tax court erred by not requiring that the measurements be tied to the alleged cause of the obsolescence. But *Eurofresh* contains no such requirement. In that case the taxpayer merely asserted that the external obsolescence was market wide. *Eurofresh*, 218 Ariz. at 385, 392, ¶¶ 13, 48. We held that it is not sufficient "to simply assert that a property's value should be reduced because of external obsolescence observed elsewhere." *Id.* at 390, ¶ 39. Instead, the taxpayer must prove that the asserted cause of the obsolescence actually affects the subject property. *Id.* Here, the tax court found that the asserted causes of the obsolescence affected the value of Transwestern. The court found that:

> Transwestern has proved through the testimony of its witnesses and expert that the value of the Property suffered from economic obsolescence. Among other evidence that the property lost value because of external forces, was the fact that The Natural Gas Supply Association ranked the return

on equity of Transwestern pipeline in 2014 at 29th of the 32 pipelines it measured. Mr. Whitehurst testified that 'we would tell anybody that this (Transwestern) was a big miss … a huge miss … wrong place, wrong time.' While there could be other reasons for this underperformance, the testimony was compelling that the reasons described above caused it.

Evidence in the record supports these findings, and Transwestern presented competent evidence supporting its expert's cost approach. Accordingly, the court did not err by reducing the Property's value for economic obsolescence.

## IV. The Tax Court Erred in Denying the Department's Motion for Partial Summary Judgment.

¶51 The Department also appeals the tax court's denial of its motion for partial summary judgment to replace the revised valuations of the Property with the error-corrected valuations of the Property. *See Transwestern Pipeline Co. v. Ariz. Dep't of Revenue*, TX 2016-000931, 2018 WL 3192537 (Ariz. Tax Ct. May 15, 2018) (tax court order). Transwestern asserts that this issue is moot because the tax court found that the revised values exceeded the market value of the Property and the error-corrected values exceed the revised values. Generally, "we will dismiss an appeal as moot when our action as a reviewing court will have no effect on the parties." *Cardoso v. Soldo*, 230 Ariz. 614, 617, ¶ 5 (App. 2012). Because we vacate the tax court's finding regarding the company-specific risk premium, we address this issue, which might arise on remand.

¶52 We review de novo the tax court's denial of the Department's motion for summary judgment and the court's interpretation of the relevant tax statutes. *See SolarCity Corp. v. Ariz. Dep't of Revenue*, 243 Ariz. 477, 480, ¶ 8 (2018).

¶53 In June 2015, the Department sent Transwestern an initial valuation of $713,430,000 for the 2016 tax year. *Transwestern Pipeline*, TX 2016-000931, at *1. In large part, that valuation was based upon information provided by Transwestern in its rendition report ("First Rendition"). *Id.* "Pursuant to A.R.S. § 42-14002(B) the parties conferred about that valuation." *Id.* The Department asked Transwestern to deduct any "acquisition adjustment" from the information it provided in its First Rendition and to submit a new rendition report, which it did ("Second Rendition"). *Id.* After Transwestern did so, the Department sent a notice of decision setting the 2016 full cash value at $639,690,000. *Id.*

**¶54** At trial before the tax court, Transwestern produced internal documents and emails during discovery, including a spreadsheet listing certain Transwestern assets. *Id.* After reviewing these disclosures, the Department asserted that Transwestern erred in the way it calculated the "Arizona Original Costs" used in its Second Rendition. *Id.* "Accordingly, in January 2017, the Department sent a Notice of Proposed Error Correction which increased the 2016 full cash value from $639,690,000 to $743,266,000," and the 2017 value from $614,375,000 to $712,891,000. *Id.*; *see* A.R.S. § 42-16252. On appeal, the Department argues that both A.R.S. § 42-16251(3)(d) (misreporting) and A.R.S. § 42-16251(3)(e)(vi) (objective error) apply in this case.[6]

**¶55** Arizona law provides a "procedure for correcting of errors occurring in assessing or collecting property taxes, whether they inure to the benefit of the taxpayer or the government." *Lyons v. State Bd. of Equalization*, 209 Ariz. 497, 502, ¶ 21 (App. 2005) (quoting 1994 Ariz. Sess. Laws, ch. 323, § 53 (2d Reg. Sess.)). "Error" is defined in A.R.S. § 42-16251(3) as "any mistake in assessing or collecting property taxes resulting from: . . . (d) Misreporting or failing to report property if a statutory duty exists to report the property."

**¶56** The tax court held that the "misreporting" section did not apply because the "Department admit[ted] that the information and data [Transwestern] used in its computation had all been provided to it before it calculated the 2016 value." *Transwestern Pipeline*, TX 2016-000931, at *2. We disagree.

**¶57** We have previously held that "mistake" is not a technical word that holds particular meaning within the law. *Ariz. Dep't of Revenue v. S. Point Energy Ctr., LLC*, 228 Ariz. 436, 440, ¶ 15 (App. 2011). "We therefore apply its common meaning, which is '[a]n error, misconception, or misunderstanding; an erroneous belief.'" *Id.* (quoting *Mistake*, Black's Law Dictionary (8th ed. 2004)).

**¶58** The undisputed facts show that in the First Rendition, Transwestern misreported its system plant in service property and in the Second Rendition, Transwestern misreported its Arizona plant in service property. This failure caused the Department to incorrectly calculate the Property's value. That the First Rendition contained the correct Arizona

---

[6] Because we vacate the tax court's ruling under the misreporting section, we need not consider the Department's argument that the report consisted of an objective error under A.R.S. § 42-16251(3)(e)(vi).

plant in service property does not make the Second Rendition any less inaccurate and thus still constitutes an "error."

¶59 Although the Department had the necessary information after receiving the Second Rendition, that does not negate the fact that Transwestern misreported information in that report. That misreporting left the Department with the erroneous belief that the Second Rendition represented an accurate value of the Property.

¶60 Accordingly, the tax court erred when it denied the Department's motion for summary judgment. On remand, the tax court shall use the error-corrected values as the statutory full cash values, subject to the requirement that full cash value "shall not be greater than market value[.]" A.R.S. § 42-11001(6).

## V. Attorney Fees.

¶61 Transwestern requests its fees on appeal pursuant to A.R.S. § 12-348(B)(1), which authorizes an award of fees to a party that "prevails by an adjudication on the merits" in a challenge to the "assessment, collection or refund of taxes." A.R.S. § 12-348(B)(1). In our discretion, we decline to award Transwestern its attorney fees. *See Wilderness World, Inc. v. Ariz. Dep't of Revenue*, 182 Ariz. 196, 202 (1995) (as amended) (noting "the award of attorneys' fees in tax cases [is] discretionary").

## CONCLUSION

¶62 For the foregoing reasons, we affirm the judgment of the tax court in part, vacate in part, and remand. On remand, the tax court shall determine whether the "error-corrected" full cash values exceed the market values. If necessary, the tax court must then determine the market value of the property for 2016 and 2017 consistent with this decision and without the inclusion of a company-specific risk premium.

